## SNELL v. INSURANCE COMPANY.

A., a member of the firm of A., B., & Co., who were the owners of cotton, communicated the facts touching its ownership, situation, value, and risk, so far as he knew them, to C., a duly accredited agent of an insurance company ; and thereupon the company, through C., entered into a verbal agreement with A., acting for and on behalf of the firm, to insure for a certain period the cotton for its whole value against loss by fire, at a premium which was subsequently paid to the company. A. assented that the insurance should be made in his name, upon the representation and agreement of C. that the entire interest of the firm in the cotton would be thereby fully protected. The cotton was burnt within the specified period. The policy was then issued and delivered to A., who, being at once advised by his attorneys that it in terms covered his interest, but not that of the firm, forthwith requested the company to correct it, so that it should conform to the agreement. The company having declined to do so, A., B., & Co. filed against it this bill, praying that the policy be reformed, and that the value of the cotton be awarded to them. *Held*, 1. That the acceptance of the policy was not such as waived any right of A., B., & Co. under the agreement covering their interest in the cotton, which A. in their behalf had made with the company, and that they are entitled to the relief prayed for. 2. That a mere mistake of law does not, in the absence of other circumstances, constitute any ground for the reformation of a written contract.

APPEAL from the Circuit Court of the United States for the Northern District of Illinois.

This was a suit in equity instituted by Thomas Snell, Samuel L. Keith, and Abner Taylor, partners under the firm name of Snell, Taylor, & Co., to reform a certain policy issued by the Atlantic Fire and Marine Insurance Company of Providence, insuring Samuel L. Keith, from Dec. 6, 1865, at noon, to Jan. 7, 1866, at noon, against loss or damage by fire, on two hundred and twenty bales of cotton, described as " stored in open

shed at West Point, Miss.; loss, if any, payable to Messrs. Keith, Snell, & Taylor."

The material allegations in the bill are as follows : That said firm, on Dec. 6, 1865, were the owners of two hundred and twenty bales of cotton, worth more than $50,000, stored at West Point, Miss., awaiting transportation to some northern market; that Keith applied in behalf of his firm to Holmes & Bro., general insurance agents at Chicago, representing several companies, including the defendant, to procure insurance upon all the cotton, for the benefit of the firm, in the sum of $49,500, during such time as it remained at West Point, which time was uncertain, in view of the difficulties of transportation; that Holmes & Bro., the duly accredited and authorized agents, among others, of the defendant, did agree with Keith, acting for and in behalf of his firm, to make, grant, and secure insurance in the companies by them represented on this cotton in the sum of $49,500, while it was stored at West Point and until shipped to a northern market, and to receive a premium of one per cent on the total amount insured, to wit, $495, which sum Keith agreed to pay Holmes & Bro., provided the time for the insurance did not exceed one month, but to have a decreased rate if the time exceeded one month, the agreed rate to be paid by Keith when the cotton was removed from West Point, when the extent of the insurance could be definitely fixed; that on Dec. 6, 1865, Holmes & Bro., with intent to carry this agreement into effect, caused to be made several policies in different companies, among them the policy sued on, making an aggregate insurance of $49,500, and after the loss occurred notified Keith to pay, and he did pay, the sum of $495, the premium on the whole amount insured, $80 of which was paid to and received by the defendant for and on account of his firm and in pursuance of the agreement with Holmes & Bro.; that the policy sued on remained in the possession of Holmes & Bro. until some time after the loss; that after the loss, and before any application to adjust the same was made, Holmes & Bro., with the intent to carry out the agreement that the cotton should be insured until its shipment from West Point, filled up the policy so that by the terms thereof the insurance extended from Dec. 6, 1865, until Jan. 7, 1866, at noon ; that Keith was assured by

Holmes & Bro., when the insurance was taken, that it was not necessary that the policy should state in terms that the insurance was for and on account of Snell, Taylor, & Co., and that the firm would be as fully protected, and the loss would be as promptly paid, as if the policy had expressly stated that the insurance was for and on its account; that relying upon those assurances, and ignorant that, by the terms and legal effect of the terms employed, no other interest in the cotton was insured except his, Keith took the policy into his possession in the full belief that it covered the entire interest of the firm; that soon thereafter, upon being advised to the contrary by his attorney, he demanded of the insurance agents that the policy be corrected so as to conform to the real contract and agreement, but Holmes & Bro. refused to correct or alter the same in any way.

The prayer of the bill is that the company be decreed and ordered to correct and reform the policy by inserting therein the stipulation that the insurance was made for the benefit or for the account of Snell, Taylor, & Co., and that the firm have a decree for the sum so intended to be insured on the cotton.

The company filed an answer traversing the allegations of the bill, and setting up sundry matters in defence. The court, upon a final hearing on the pleadings and proofs, dismissed the bill, and the complainants appealed to this court.

*Mr. Leonard Swett*, for the appellants, contended that the error committed · by inserting the name of Keith instead of that of the firm as the party assured, when the contract was reduced to writing, would not defeat their rights; but that the policy would be reformed so as to effectuate the intention of the parties, and be enforced by a court of equity. *Ellis* v. *Towsley*, 1 Paige (N. Y.), 278, 279; *Franklin Fire Insurance Co.* v. *Hewitt*, 3 B. Mon. (Ky.) 231; *Harris* v. *The Columbian Insurance Co.*, 18 Ohio, 121; *New York Ice Co.* v. *Northwestern Insurance Co.*, 23 N. Y. 359; *Woodbury Savings Bank* v. *Charter Oak Insurance Co.*, 31 Conn. 526; *The Malleable Iron Works* v. *Phœnix Insurance Co.*, 25 id. 465.

No counsel appeared for the appellee.

MR. JUSTICE HARLAN delivered the opinion of the court.

The elaborate answer of the insurance company comprehends, in the form of express denials and affirmative statements, almost every defence which the ingenuity and skill of able counsel could suggest. But in view of the points to which the evidence seems to have been mainly directed, it is only necessary to consider certain grounds of defence, which will sufficiently appear in this opinion.

We are satisfied that a valid contract of insurance was entered into, on the 6th of December, 1865, between Keith, representing Snell, Taylor, & Co., and Holmes & Bro., representing the defendant and other insurance companies, and we entertain no serious doubt as to its terms or scope. Although there is some conflict in the testimony as to what occurred at the time the contract was concluded, it is shown, to our entire satisfaction, not only that the agreed insurance covered the two hundred and twenty bales of cotton, but that Holmes & Bro., with knowledge or information that the cotton was owned by Snell, Taylor, & Co., and not by Keith individually, intended to insure, and, by direct statements, induced him to believe that they were insuring, in his name, the interest of the firm. He assented to the insurance being taken in his name, because of the distinct representation and agreement that the interest of the firm would be thereby fully protected against loss by fire so long as the cotton remained at West Point. But according to the technical import of the words used in the policy which the company subsequently issued and delivered, only Keith's interest in the cotton is insured. Such is the construction which the company now insists should be put upon the policy, if the court decides that there was a binding contract of insurance. The fundamental inquiry, therefore, is whether Snell, Taylor, & Co. are entitled to have the policy reformed so as to cover their interest.

We have before us a contract from which, by mistake, material stipulations have been omitted, whereby the true intent and meaning of the parties are not fully or accurately expressed. A definite, concluded agreement as to insurance, which, in point of time, preceded the preparation and delivery of the policy, is established by legal and exact evidence, which removes all

doubt as to the understanding of the parties. In the attempt to reduce the contract to writing there has been a mutual mistake, caused chiefly by that party who now seeks to limit the insurance to an interest in the property less than that agreed to be insured. The written agreement did not effect that which the parties intended. That a court of equity can afford relief in such a case, is, we think, well settled by the authorities. In *Simpson* v. *Vaughan* (2 Atk. 33), Lord Hardwicke said that a mistake was "a head of equity on which the court always relieves." In *Henkle* v. *Royal Exchange* (1 Ves. Sen. 318), the bill sought to reform a written policy after loss had actually happened, upon the ground that it did not express the intent of the contracting parties. The same eminent judge said: "No doubt but this court has jurisdiction to relieve in respect of a plain mistake in contracts in writing as well as against frauds in contracts, so that if reduced to writing contrary to the intent of the parties, on proper proof, would be rectified." In *Gillespie* v. *Moon* (2 Johns. (N. Y.) Ch. 585), Chancellor Kent examined the question both upon principle and authority, and said: "I have looked into most, if not all, of the cases in this branch of equity jurisdiction, and it appears to me established, and on great and essential grounds of justice, that relief can be had against any deed or contract in writing founded in mistake or fraud. The mistake may be shown by parol proof, and the relief granted to the injured party, whether he sets up the mistake, affirmatively by bill, or as a defence." In the same case he said: "It appears to be the steady language of the English chancery for the last seventy years, and of all the compilers of the doctrines of that court, that a party may be admitted to show, by parol proof, a mistake, as well as fraud, in the execution of a deed or other writing." And such is the settled law of this court. *Graves* v. *Boston Marine Insurance Co.*, 2 Cranch, 419; *Insurance Company* v. *Wilkinson*, 13 Wall. 222; *Bradford* v. *Union Bank of Tennessee*, 13 How. 57; *Hearne* v. *Marine Insurance Co.*, 20 Wall. 488; *Equitable Insurance Co.* v. *Hearne*, id. 494. It would be a serious defect in the jurisdiction of courts of equity if they were without the power to grant relief against fraud or mutual mistakes in the execution of written instruments. Of course parol proof,

in all such cases, is to be received with great caution, and, where the mistake is denied, should never be made the foundation of a decree, variant from the written contract, except it be of the clearest and most satisfactory character. Nor should relief be granted where the party seeking it has unreasonably delayed application for redress, or where the circumstances raise the presumption that he acquiesced in the written agreement after becoming aware of the mistake. Hence, in *Graves* v. *Boston Marine Insurance Co. (supra)*, this court declined to grant relief against an alleged mistake in the execution of a policy, partly because the complainant's agent had possession of the policy long enough to ascertain its contents, and retained it several months before alleging any mistake in its reduction to writing. But no such state of case exists here. The policy in question was retained for Keith by the insurance agents. It was not surrendered to him, nor did he see it, until after the loss had happened. Immediately upon being advised by his attorney that the policy, in terms, covered only his individual interest, he promptly avowed the mistake, and asked that it be corrected in conformity with the original agreement. There was no such acceptance by him of the written policy as would justify the inference that he had either waived any rights existing under the original agreement, or conceded that the instrument correctly set forth the contract.

It may be said that the mistake made out was a mistake of law, and, therefore, not relievable in equity. It was stated in *Hunt* v. *Rousmaniere's Administrators* (1 Pet. 1), as a general rule, that mistake of law is not a ground for reforming a deed, and that the exceptions to the rule were not only few in number, but had something peculiar in their character. The court, however, was careful to say that it was not its intention " to lay it down, that there may not be cases in which a court of equity will relieve against a plain mistake, arising from ignorance of law." In the same case (8 Wheat. 174), Mr. Chief Justice Marshall said that he had found no case in the books in which it has been decided that a plain and acknowledged mistake of law was beyond the reach of equity. In 1 Story, Eq. Jur., sect. 138 *e* and *f* (Redf. ed.), the author, after stating certain qualifications to be observed in granting relief upon the ground of

mistake of law, says that " the rule that an admitted or clearly established misapprehension of the law does create a basis for the interference of courts of equity, resting on discretion, and to be exercised only in the most unquestionable and flagrant cases, is certainly more in consonance with the best considered and best reasoned cases upon the point, both English and American." The same author says : " We trust the principle that cases may and do occur where courts of equity feel compelled to grant relief, upon the mere ground of the misapprehension of a clear rule of law, which has so long maintained its standing among the fundamental rules of equity jurisprudence, is yet destined to afford the basis of many wise and just decrees, without infringing the general rule that mistake of law is presumptively no sufficient ground of equitable interference."

In the case under consideration, the alleged mistake is proven to the entire satisfaction of the court. It is equally clear that the assent of Keith to the insurance being made in his name was superinduced by the representation of the company's agent, that insurance in that form would fully protect the interest of the firm in the cotton. We assume, as we must from the evidence, that this representation was not made with any intention to mislead or entrap the assured. It is, however, evident that Keith relied upon that representation, and, not unreasonably, relied also upon the larger experience and greater knowledge of the insurance agents in all matters concerning the proper mode of consummating, by written agreement, contracts of insurance according to the understanding of the parties. He trusted the insurance agents with the preparation of a written agreement which should correctly express the meaning of the contracting parties. He is not chargeable with negligence, because he rested in the belief that the policy would be prepared in conformity with the contract. As soon as he had a reasonable opportunity to consult counsel, he discovered the mistake, and promptly insisted upon the rights secured by the original agreement. A court of equity could not deny relief under such circumstances, without aiding the insurance company to obtain an unconscionable advantage, through a mistake, for which its agents were chiefly responsible. In all such cases, there being

no laches on the part of the party, either in discovering and alleging the mistake, or in demanding relief therefrom, equity will lay hold of any additional circumstances, fully established, which will justify its interposition to prevent marked injustice being done.   *Wheeler* v. *Smith*, 9 How. 55.

In deciding, therefore, as we do, that the complainants are entitled to have the policy reformed in accordance with the original agreement, it is not perceived that we enlarge or depart, in any just sense, from the general and salutary rule, that a mere mistake of law, stripped of all other circumstances, constitutes no ground for the reformation of written contracts.

We have not overlooked, in this connection, that portion of the evidence which shows that Holmes & Bro., when, by letter, advising the company of the contract, stated, in a postscript, that the insurance would be for a few days only.   The officers of the company testify that they would not have permitted the contract to stand, and would have promptly cancelled the policy, had they not supposed the insurance would last but a few days. It was doubtless the belief of Keith, which he expressed to the insurance agents, that the cotton would not remain at West Point beyond a few days.   The evidence shows that he had reasonable ground for such belief.   But he seems to have guarded against disappointment in that regard, by having it distinctly agreed that the insurance should last until transportation could be obtained, and the cotton shipped from West Point.   That Holmes & Bro. so understood the agreement is evident from their letter of Dec. 6, 1865, to the secretary of the company, in which they state that they had taken insurance "on two hundred and twenty bales of cotton stored in open shed at West Point, Miss., said cotton to remain insured from above date till time of shipment."   It is true that the response of the secretary shows that the company did not approve of such risks. But the contract was not repudiated or cancelled, and they only enjoined upon their agents to "decline such business in future."   The act of the agents in filling up the blanks in the policy after the loss had occurred was manifestly in consummation of the original contract of insurance.

But independently of the issue in the pleadings as to the mistake in reducing the contract to writing, the company de-

fends the action, and denies its liability upon other grounds, which must now be considered.

The answer alleges that at the time of, and prior to, the alleged verbal contract of insurance the cotton was guarded, night and day, by soldiers of the United States, who occupied the shed in which it was stored, and who were in the habit of sleeping and eating their meals upon it, and smoking and otherwise using fire upon it, or in its immediate vicinity; that those facts were material to the risk, and would or might have influenced Holmes & Bro. and the company in taking and con tinuing the insurance, or in regard to the rate of premium; and that such facts, although well known to Keith when he applied for insurance, were not communicated by him to Holmes & Bro., or to the company, but were concealed, whereby the contract of insurance, whether reduced to writing correctly or not, became and was void.

The evidence does not authorize a defence upon such grounds. The proof does not show that Keith, when applying for insurance, withheld any fact known to him, and material to the risk. By the terms of the policy, he was under an obligation to make a just, full, and true exposition of all the facts and circumstances in regard to the condition, situation, value, and risk of the property insured, so far as the same were known to him, and were material to the risk. The same clause of the policy provides that the risk shall cease, and the policy become null and void, "if any material fact or circumstance shall not have been fairly represented." This language must, of course, be construed in connection with the preceding words of the same clause. We find no evidence in the record showing that Keith did not fairly represent every material fact known to him. Rawley, who was within hearing of the conversation between Keith and Edgar Holmes (the active manager of the business of Holmes & Bro.), says, that while he cannot recall the language used, he is "positive that Keith explained the character of the risk. . . . I know Keith described the character of the risk fully." When Keith applied to Edgar Holmes for the insurance, the latter asked him how the cotton was stored. He replied, " In an open shed." Holmes then said that he did not like the manner in which it was stored; and Keith replied, it

" was guarded day and night." Thus were Holmes & Bro. notified of its condition and situation. The information that it was guarded day and night indicated that there was something in the attendant circumstances which made a guard necessary for its safety. Indeed, if it was to remain, while under insurance, in an open shed, and at a point remote from the company's place of business, it was clearly in the interest of the insurer to have it guarded day and night. But it is said that the habits of the guard were such, at the time of the insurance, as to endanger its safety. If this were clearly proven, the evidence furnishes no ground for imputing to Keith or Snell or Taylor knowledge of any habitual carelessness or misconduct upon the part of the guard which increased the danger of the cotton being burned.

The answer further alleges that on the 8th of December, 1865, whatever cotton there was in the shed at West Point belonging to the complainants was seized by the United States government, or by its officers, under its orders and direction, excluding complainants thereafter from all possession and control over the cotton, and that such seizure and exclusion from possession and control were maintained until the cotton was burned; that after such seizure the shed passed to the exclusive possession of soldiers of the United States, who were in the habit of using the same for military defence, of sleeping and eating therein, and of smoking and otherwise using fire upon it and in its immediate vicinity; that at the time of the alleged verbal contract of insurance large quantities of loose cotton were lying under the flooring of the shed, which consisted of loose boards, and immediately under the cotton stored in the shed, whereby the risk of fire was greatly increased; that these facts were, each and all of them, material to the risk, and would or might have influenced the judgment of Holmes & Co. and of the company in regard to continuing the insurance, or to the rate of premium therefor; that Taylor, one of the complainants, knew these facts on the 8th of December, 1865, and in ample time before the fire to have communicated them to the company's agents, and sufficiently long before to have enabled the company to cancel the policy and give complainants timely notice thereof; that by reason of his concealing them

from the company and its agents, the policy became and was wholly void.

This defence is doubtless based upon that clause in the policy which declares that "if the situation or circumstances affecting the risk thereupon (the property) shall be so altered or changed, either by change of occupancy in the premises insured, or containing property insured, or from adjacent exposure, whereby the hazard is increased, and the assured fail to notify the company, or if the title to said property shall be in any way changed, . . . in every such case the risk thereupon shall cease and determine, and the policy be null and void."

It will be observed that an alteration or a change in the occupancy of the premises containing the insured property, unless it increases the hazard, does not avoid the policy, although no notice be given to the insurer. We have already seen that when the contract was made the company's agents were informed that the cotton was guarded by day and by night. There was no change in the character of the guard, except that prior to Dec. 8, 1865, Federal soldiers guarded it as a personal favor to Taylor, while after that date they did so under an order for its seizure. There is some evidence that they were, at times, negligent and careless; but we are not satisfied that their conduct was such as to increase the hazard. In view of the peculiar condition of public sentiment at West Point and in its vicinity against Taylor and others, who had been officially connected with the seizure and collection of cotton, under treasury regulations, the strong presumption is that the presence of Federal soldiers largely decreased, rather than increased, the hazard, and was, therefore, for the benefit of all parties interested in the preservation of the property. We attach no weight to its seizure, under orders of Federal officials, as, in and of itself, affecting the rights of the assured. It had been purchased by Taylor for his firm, and with its money, and it does not appear that any of the cotton claimed by him for the firm did, in fact, belong to the United States, or had become forfeited by reason of his violation of the laws, or of the treasury regulations made in pursuance of them. Nor does it appear that he caused or promoted its seizure. So far as the record shows, it was an unauthorized seizure of the private

property of the citizen, caused by the personal hostility towards Taylor of a former treasury agent, who had himself been suspended from his position through the influence or machinations, as he suspected or believed, of Taylor. If, as alleged, the cotton, upon its seizure, passed from the control of the owner to the exclusive temporary possession of Federal officers, such change did not, by the terms of the policy, impose upon the assured the duty of communicating to the company that fact. It was only when the change in the surrounding circumstances increased the hazard that the assured was under an obligation to inform the company thereof. If the seizure had involved a change of title, then the company could have elected to avoid the policy, since it contains express stipulations to that effect. But, as already said, the record furnishes no evidence of any change of title, but only a change of possession and control, made without the assent of the owner, and which he, perhaps, had no power to prevent; and it does not clearly appear that the hazard was thereby increased.

We come now to the only remaining question which it seems necessary to consider; viz., the quantity of. cotton in the shed belonging to Snell, Taylor, & Co. at the time of the fire.

Upon this point a large amount of testimony was taken which is of a very unsatisfactory nature. Witnesses who passed and repassed the shed from time to time, and who had no special reason for making an estimate of the cotton there stored, were asked to give their best judgment as to the quantity.

If the record contained no other evidence than such opinions of witnesses, the court would have great difficulty in reaching a conclusion as to the quantity of the cotton burned. But there is other and better evidence upon which to rest the determination of this question. The officer commanding the Federal troops stationed at West Point, and who were in possession of the shed from a date prior to Dec. 6, 1865, up to the time of the fire, states that about the time he took possession, under orders from Federal officials, he examined its general condition and counted the bales,—not every bale, but made such a count as satisfied him that there were not less than two hundred and twenty bales, certainly over two hundred bales. He

swears that none of the cotton claimed by Taylor was removed after he took possession of the shed, and he was in such possession up to the time of the fire, except for about two weeks in the latter part of December, during which time Captain Pyle guarded it under the same order. But the most important evidence upon this point comes from the witness Freel. Under the authority of the freight conductor of the Memphis and Charleston Railroad Company he contracted with Taylor for the transportation of this cotton to Memphis. He made a contract with Taylor for its shipment as soon as the conductor could get to West Point with the necessary cars. In order to ascertain the number of cars needed for the transportation, he counted the bales in the shed, claimed by Taylor, as well as it was possible for him to do. He found that the front tier contained forty-five bales, and that there were five tiers, and his calculation was that transportation was needed for two hundred and twenty-two bales. At the time of this count, which was in the last of December, he made a memorandum for the benefit of the conductor, in a memorandum-book which he produced when giving his testimony. The memorandum was, " 222 bales of Taylor's cotton for you to get cars for."

The conductor expected to reach West Point with the cars by the first day of January, but he failed to do so. The cars reached West Point on the 7th, the day after the fire, for the purpose of transporting the cotton to Memphis under the contract made by Freel with Taylor. We see no escape, under the evidence, from the conclusion that there were two hundred and twenty-two bales in the shed, belonging to Taylor's firm, at the time of the fire, unless some of it was stolen or fraudulently withheld after Freel's count. Only one witness states any fact from which it may be inferred that any portion of the cotton was stolen prior to the fire, and he only speaks of eight or nine bales being taken off, with the consent of the guard, during a certain night when Taylor was absent from the shed. If that quantity be deducted, as we think it must be, there will be left two hundred and thirteen bales of cotton, averaging, according to the testimony, five hundred pounds per bale, and worth, at the place of its destruction, forty cents per pound.

The decree of the court below will be reversed, with directions to enter a final decree in conformity with this opinion; and it is

*So ordered.*