ALLEN and others *v.* GALLOWAY and another.

*(Circuit Court, W. D. Tennessee. March 5, 1887.)*

1. EQUITY—MISTAKE OF LAW.
    Whatever rule may prevail elsewhere, there can be, in the equity courts of the United States, no relief from a mistake of law.

2. SAME—CASE IN JUDGMENT—PARTNERSHIP ASSETS—APPROPRIATION TO INDIVIDUAL DEBTS.
    Where the creditor of an individual partner appropriated, in part payment of his claim, a balance due from himself to that partner's firm, but upon garnishment was compelled to pay the amount so appropriated to a creditor of the firm, *held*, that a compromise settlement, pending the garnishment, made in the belief that the appropriation was valid, would not be set aside on the ground of mistake, upon the appropriation being afterwards decided invalid, there being no element of deception by misrepresentation or other fraud, nor any mistake as to the facts.

In Equity.

Plaintiffs are cotton factors at New Orleans, and defendants were a firm of merchants in Tennessee, shipping cotton to them. Plaintiffs owed the defendant firm a balance on account. During the season, Galloway, one of the defendants, opened an account *individually* with plaintiffs, shipping cotton to secure his margins for speculations in cotton futures. Upon this account he owed a large balance to plaintiffs. Defendants, be-

coming insolvent, made an assignment, and thereupon Carter Bros. attached by garnishment the balance due the firm in plaintiffs' hands. After the garnishment was levied, the plaintiffs, on the authority of a letter from the individual partner written in the name of the firm, transferred the balance due the firm as a credit to the individual account, leaving still a balance due from the individual partner to plaintiffs' firm. This letter was written a few weeks before the defendants' assignment; was signed "GALLOWAY & BURNS, per W. H. G.;" and in substance directed plaintiffs to protect his future contracts, saying he had that day shipped them four bales of cotton "as margin," and would ship more soon. The firm afterwards acquiesced in this, and did not forbid or object to it, although Burns did not know of it until after the failure and the subsequent transactions. The attaching creditors, however, denied the validity of the appropriation, and the garnishment was decided in their favor in the supreme court of Louisiana. While that suit was pending, the defendants, through their assignee, offered in writing terms of compromise to all their creditors at 33⅓ per cent.; the plaintiffs being set down in the writing as creditors *of the firm* at the sum remaining after the above-mentioned transfer. This compromise Carter Bros. signed, saying in their agreement, "except that part of their debt which is considered secured," and afterwards plaintiffs also accepted, and, being paid, executed a receipt in full of all demands against the firm, or either of them. When plaintiffs had lost the garnishment suit, and were compelled to pay the balance to Carter Bros., they at first sued the defendants at law in this court upon the balance of the account after crediting the compromise payment, and eliminating the amount paid to Carter Bros. But at the trial they took a nonsuit, and then filed this bill to cancel the settlement and receipt as a mistake concerning the amount due.

*McCorry & Bond,* for plaintiffs.

*Henry C. Towns,* for defendants.

HAMMOND, J. Whatever rule may prevail elsewhere, there can be, in the equity courts of the United States, no relief from a mistake of law. *Hunt* v. *Rousmaniere,* 1 Pet. 1, 15; *Bank of U. S.* v. *Daniel,* 12 Pet. 32, 55; *Railroad Co.* v. *Soutter,* 13 Wall. 517, 524; *Upton* v. *Tribilcock,* 91 U. S. 45, 50, 51; *Lamborn* v. *County Com'rs,* 97 U. S. 181, 185; *Snell* v. *Insurance Co.,* 98 U. S. 85, 90, 92; *U. S.* v. *Ames,* 99 U. S. 35, 46, 47.

It was distinctly proclaimed in *Snell* v. *Insurance Co., supra,* that the ruling in that case was not to be considered as any departure from the general and salutary principle to which the court had always adhered. And most of the above cases will illustrate the application of it to facts like those we have here. In the case just cited the judgment is founded on the fact of a misrepresentation of the legal effect of the words used in a policy by the agent of the insurance company, innocently made, no doubt, but nevertheless operating as a deception of one party to the contract by the other, in a case where the party misled might reasonably rely

upon the other for a correct selection of the proper form of contract, to accomplish their agreement.

But in this case there is no circumstance like that, or anything approaching it. It is absolutely bare of any incident to take the case out of the category of a pure mistake of law, unmixed with any element of misrepresentation, accident, or fraud upon the part of anybody. It is said there was a mistake of fact as to the true state of the account, but that is untenable. It is only another way of saying that Allen believed that he had the right to make the appropriation of the balance due Galloway & Burns to the payment of the balance due from Galloway, individually. He relied with too much confidence upon that opinion of the law which was overthrown by the supreme court of Louisiana. *Carter* v. *Galloway*, 36 La. Ann. 473, and Id. 730. In the first of these cases the plaintiffs were garnishees, the suit involved these very transactions, and we have that record in proof in this case; while in the second, another firm of creditors similarly situated, and attempting to save themselves by a similar process, were garnishees; but the court, properly, as we think, if we may be called on to say that, did not permit the partnership assets of the defendants to be so diverted to the payment of the individual debts of one of the firm.

But, even if the court were wrong in that judgment, it is impossible now and here, by this proceeding in equity, to set aside the settlement, any more than by the suit at law upon a newly stated account, as to which plaintiffs took a nonsuit at a former term. The decision in Louisiana was final as to the law of the transaction, and the plaintiffs cannot thus mitigate the loss occasioned to them by any real or supposed error of the court, and thereby transfer the burden of it to the firm of Galloway & Burns, or to Galloway individually, as they are here attempting to do. They do not show by the proof here, any more than they did in the Louisiana suit, that Burns ever consented to the arrangement by which they undertook to appropriate the firm's assets to the payment of Galloway's losses in futures. Indeed, taking into view only Galloway's own letters, upon which alone Allen acted in making the appropriation, and it may be doubtful if they fully justify the assumption that even he authorized it; but this is immaterial, as we consider the case as if he had given the fullest authority.

But it is argued that Allen expected Burns to testify in the Louisiana suit that he, too, had given authority and consented to the appropriation, and that Burns "went back on him," to use the expression of the idea in the argument. This was a wholly gratuitous expectation, for there is not a particle of proof that Burns encouraged or countenanced it by anything he ever said or did about the matter,—not in the least. The most that can be said is that he was quiescent, as the Louisiana court said, and the proof here is not any better on that point than it was there. But in the view of the supreme court of Louisiana, as expressed in the opinions cited, it would possibly have made not the least difference in their judgment if Burns had expressly authorized the appropriation, and had testified to that fact. For it may well be doubted, on the law of

partnership, whether it is competent for all the partners, by any consent or act of theirs, to appropriate the firm assets to the payment of individual debts, after they have failed and become insolvent, and far more doubtful if they could do this, as Allen attempted to do, after creditors have attached the assets.

But, aside from this, Allen's attitude at the time of the compromise settlement cannot be improved by such expectations as that. He made no such conditions in his acceptance of the compromise as that certain proof should be made, or that certain facts should exist. He was master of the situation,—altogether so,—and might have said to his debtor that, if he should lose the suit then pending, the balance due him would be more than if he should win it, and that some provision must be made for that contingency. But he did not. He accepted the offer made on the basis of gaining the suit; that is to say, he gave his receipt in full at the figures that would be due if he should win, and either never thought of losing, or was willing to take the chances. He relied with abundant confidence, fortified, no doubt, by the opinion of counsel, upon his belief that, as a matter of law, he could, notwithstanding the pending attachment, upon Galloway's instructions,—or Galloway & Burns', if you please,—appropriate the balance due from the firm to the payment of the individual debt of one of the partners. This was a grievous mistake as it turned out, but he has no one to blame but himself; and one has only to observe, as he appears on the witness stand, his enthusiastic confidence in his own judgment, to know that he is the very man to stand fast by his own convictions, and never stop to doubt them.

Yet, if we remember the real situation as it then existed, this was not an unwise acceptance of the compromise offered. Galloway & Burns, as a firm, really owed Allen's firm nothing whatever, but the indebtedness was the other way. Anything offered by this bankrupt firm out of their firm assets in payment of Galloway's individual indebtedness to Allen, West & Bush was so much clear gain; and the assent of other creditors,—who might have objected to this appropriation, as they did to that already attempted to be made,—by joining in the compromise, would make *that*, at least, secure as a payment, whatever fate should befall the other. It was like a game in which Allen had everything to gain, and nothing to lose that was not already lost, if his judgment about the Carter Bros.' garnishment should be in fault. True, he might have held to Galloway's liability for the full amount of his gambling losses in futures, but that was a sorry prospect at that time, (it has improved since by his recovery of his credit, etc.,) with the firm insolvent, as it was, and the individual members equally so. To partly pay this gambling debt of Galloway's, there were the chances, in the lottery of litigation, that he would draw the prize of a decision in his favor on the Carter garnishment, whereby he would receive $335.56 of the firm assets of an insolvent partnership not at all liable for the debt; and now here comes this same firm, and further offers, and this by consent of creditors, a surely safe prize of $226.30 more of these same assets, provided he would release both the firm and Galloway from all claims upon

them. If he should win the Carter suit, there were $661.86 paid on a debt of $934 against an insolvent debtor out of assets of a firm which was also insolvent, and compromising at 33⅓ per cent., not at all liable for that debt. If he should lose the Carter suit, there were still $226.30 realized on this desperate debt out of these same insolvent assets, not at all liable to pay it. Why should he not have accepted, particularly as Galloway might plead the gambling act, as he subsequently did, when sued at law, and does' here? The plea might not avail him, and we do not wish to be understood, by this characterization of the transaction, as casting any odium on the plaintiffs because of its being a debt for losses in futures; but, nevertheless, it added to the desperate condition of the claim, and affords a more abundant justification for the acceptance of the compromise.

But, the plaintiffs having lost the Carter suit, there is disappointment in that regard, and the prize drawn in this game of commercial chances is not as large as was expected; yet it is none the less a prize to the extent of the $226.30 paid on the compromise. If not the capital, it is an approximation prize, and should not be spurned. If the account had stood, at the time of the compromise, as it is claimed that it stands to-day, there would still have been simply a debt of $934 against Galloway individually, for his losses in futures. Galloway & Burns, solvent or insolvent, would not have been bound to pay it; and whether they would have been willing to pay 33⅓ per cent. of the whole sum for Galloway's release or only that per cent. on a less sum, as they did agree, is altogether a matter of conjecture, and, being purely a gratuity, anything so obtained was so much gained.

The case stands no better against Galloway individually. About what fact were the plaintiffs mistaken at the time of the compromise? They had the correspondence in writing, which spoke for itself; and they knew with the utmost accuracy every fact and circumstance connected with either the dealings of the firm or Galloway. They knew of the failure, knew of the garnishment already levied, knew that the right to make the appropriation was thus challenged, and the precise grounds of the challenge. Knowing all this before the appropriation was made, and having a suit pending to test the validity of the transaction as against creditors who had attached the balance before any change was made in the accounts, or the book-keeping relating to them, it is idle to talk about any mistake of fact. Neither did Galloway or Burns, or their assignee in insolvency, who made the compromise, do anything to mislead or deceive or misrepresent any fact concerning the condition of the assets, or that of the partners, or do anything to induce the plaintiffs to fall into any error of either law or fact. Carter Bros. especially reserved their rights as a condition to their agreement to the compromise; and this, on the face of the paper. There the condition stood, staring plaintiffs in the face when they signed the compromise agreement, and was in itself a challenge to them to be careful about their action. It has occurred to me that this fact might possibly preclude all relief, upon the ground that here was an *agreement* by the plaintiffs to take the chances

of that suit in consideration of being permitted to share for an individual debt in the partnership assets; but we need not go into the complications of that subject.

This would seem to dispose of the case, but there is still another consideration that should be suggested as giving strength, at least, to this judgment. Under the most favorable circumstances, courts of equity do not cancel agreements to correct mistakes, except where they can restore the *status quo*, unless there be a most imperative equity that requires a disregard of that rule. *Grymes* v. *Sanders*, 93 U. S. 55, 62. To place the parties in *statu quo* would be a very difficult operation in this case, if it were possible to be done at all. The plaintiffs do not offer, either in the bill—and perhaps that would be fatal on demurrer—or at the hearing, to restore the $226.30 received on the compromise. If the settlement be canceled, that money belongs to the firm of Galloway & Burns, or equitably to their creditors, who were parties to the compromise. Plaintiffs surely cannot play fast and loose by keeping the consideration for the release, and, at the same time rescinding it; and yet this is what they ask to do. They ask a judgment against Galloway, or the firm, for the whole of his individual debt, *which the firm has never promised to pay*, less the amount already received; or, at least, a decree for 33⅓ per cent. of the full amount, and to take *the firm's money* as a credit on that, etc. It is useless to pursue the subject under such difficulties, with such a pretense of equity as the plaintiffs show here.

Dismiss the bill at plaintiffs' costs. So ordered.