## MARSHALL *v.* LANE.

DEEDS; TENANCY BY THE ENTIRETY; REFORMATION OF DEED; MISTAKE.

1. Prior to the adoption of sec. 1031 D. C. Code (31 Stat. at L. 1352, chap. 854), a conveyance of land to a husband and wife, "to have and to hold the said land unto and to the only use of the parties of the second part, their heirs and assigns, forever," created a tenancy by the entirety in the husband and wife, and not a tenancy in common.

2. An admitted or clearly established misapprehension of the law creates a basis for the interference of courts of equity, resting on discretion, to be exercised only in the most unquestionable and flagrant cases.

3. The rule that equity will not reform a deed on the ground of mistake where the mistake is one of law applies only where the word "law" is used in the sense of general law, or law of the country, and does not apply where it is used in the sense of a private right, for in such case the mistake is really one of fact.

4. Where land was conveyed to a husband and wife in such terms as to vest in them a tenancy by the entirety, but their intention was to hold as tenants in common, and they believed the legal effect of the deed was to make them hold as tenants in common, a court of equity will, after the death of the husband, reform the deed, on the ground of mistake, and vest the title to one half of the land in the heirs of the husband.

No. 1582. Submitted March 8, 1906. Decided April 3, 1906.

HEARING on an appeal by the defendant from a decree of the Supreme Court of the District of Columbia granting reformation of a deed. *Affirmed.*

The COURT in the opinion stated the facts as follows:

Edith A. Lane, as sole heir at law of Edmund J. Overand,

filed this bill against Emma J. Overand, surviving wife of said Edmund J. Overand, to reform a deed, under which the latter claimed title to lot 8 in John G. Slater's subdivision of lots in square 917, in the city of Washington, and to vest the title of one half thereof in the complainant.

It appears that in 1883 Edmund J. Overand married the defendant, who was then a widow, in the State of New York, where they then resided. Each had one child, a daughter, and no children were born of the last marriage. Removing to Washington, where the husband obtained a position in the Bureau of Engraving upon a salary of about $125 per month, they concluded to purchase the lot in controversy, the same having a brick dwelling upon it. The price paid was $5,500, the bulk of which was in monthly instalments.

There was some question between them as to how the title should be taken, and it was determined that it should be in the names of both, that is to say, one half to each. The conveyance was made to them, reciting their names and the consideration as paid by both, and the habendum clause read thus: "To have and to hold the said land and premises and appurtenances unto and to the only use of the parties of the second part, their heirs and assigns, forever."

While the strict legal effect of the terms of the deed, as the law then was in the District of Columbia, was to create a tenancy by the entirety in the husband and wife, it is quite clear from the evidence that both of the grantees intended and understood it to vest the title in them as tenants in common. The mutual friend who advised them to make the purchase so understood the direction to make the deed, though he also, erroneously, advised them that, being a homestead, the survivor would be entitled to the possession of the interest of the first one deceased, during his or her life. This friend had some knowledge of the law of a western and a southern State, wherein such rights exist in a family home, and wherein joint tenancy and tenancy by the entirety had long since been abolished.

Nothing occurred to disturb this belief, and both evidently remained therein until the death of the husband, which occurred

on August 5, 1903. Though the direct evidence is ample to sustain this conclusion, it is further attested by the fact that the husband was induced to sign a will some time before his death, wherein he undertook to give all of his property, real, personal, and mixed, to his wife, relying upon her to do what was right by his daughter, and providing that, if his wife should die without leaving a will, or having sold his real estate, then 'it was his desire that his undivided one-half interest in his real estate, and the whole of his personal estate, shall go to his daughter Edith. It appears that he had no other real estate than the interest which he supposed was vested in him by the deed aforesaid. Whether this will was formally executed was not attempted to be proved, but it went into the possession of the defendant, was produced by her, and no attempt has ever been made to probate it. The defendant died after the decree was rendered sustaining the bill and granting its prayer for relief, and Mae Marshall, her heir at law, was made a party in her stead, and has prosecuted this appeal.

*Mr. B. F. Leighton* for the appellant.

*Mr. Daniel W. O'Donoghue* and *Mr. Arthur A. Alexander* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

Under the facts before recited, it is contended, on behalf of the appellant, that they show, at most, but a mere mistake of law, from the effects of which a court of equity will not relieve.

It is true that, as a general rule, equity will not reform a written instrument where there has been no element of imposition, and the single thing not understood by the parties is the legal effect of the language used. But, while this rule obtains, there are many well-established exceptions to its operation, under one of which we think this case falls.

As was said by Mr. Justice Harlan, in *Griswold* v. *Hazard,* 141 U. S. 260, 284, 35 L. ed. 678, 688, 11 Sup. Ct. Rep. 972, 999 : "While it is laid down that 'a mere mistake of law, stripped of all other circumstances, constitutes no ground for the reformation of written contracts,' yet, 'the rule that an admitted or clearly established misapprehension of the law does create a basis for the interference of courts of equity, resting on discretion and to be exercised only in the most unquestionable and flagrant cases, is certainly more in consonance with the best-considered and best-reasoned cases upon this point, both English and American,' "—Citing *Snell* v. *Atlantic F. & M. Ins. Co.* 98 U. S. 85, 90, 92, 25 L. ed. 52, 54, 55, and many other cases.

In the case quoted from, a formal bond in a legal proceeding had been executed by the party asking relief from its obligation, and in coming to its conclusion the court said (p. 283, L. ed. p. 688, Sup. Ct. Rep. p. 979) : "There was no mistake as to the mere words of the bond; for it was drawn by one of Hazard's attorneys, and was read by Griswold before signing it. But according to the great weight of the evidence, there was a mistake on both sides as to the legal import of the terms employed to give effect to the mutual agreement. In short, the instrument does not express the thought and intention which the parties had at the time of its execution. And this mistake was attended by circumstances that render it inequitable for the obligees in the bond to take advantage of it."

In the case at bar the equity for reformation is even stronger. The facts show plainly what interest the grantees in the deed intended to take, and fully believed they had taken. The grantor had no interest in the matter, and doubtless thought that the deed conformed to that intention. The technical language of the conveyance would, at that time, have vested title in the grantees as tenants in common everywhere throughout the Union, probably, save in the District of Columbia, and would therein now under the recently adopted Code (§ 1031 [31 Stat. at L. 1352, chap. 854]). The grantees accepted the deed, apparently without examination, and certainly without taking skilled advice in respect of the legal effect of the terms employed

to pass the title; and neither party seems ever to have entertained a suspicion that their instructions had not been given complete legal effect.

The mutual mistake made under such circumstances comes nearer being one of fact than of law, and is subject to reformation upon established legal principles applicable to mistakes of that character. 2 Pom. Eq. Jur. sec. 845; *Park Bros.* v. *Blodgett,* 64 Conn. 28, 34, 29 Atl. 133; *Canedy* v. *Marcy,* 13 Gray, 373, 376; *Trusdell* v. *Lehman,* 47 N. J. Eq. 218, 220, 20 Atl. 391.

Again, the mutual mistake of the parties in respect of the title under which they held the property is analogous to a mistake of fact, in that it was a mistake of private right rather than of general law relating to the subject-matter of an ordinary contract. *Cooper* v. *Phibbs,* L. R. 2 H. L. 149. The complainant in that case had, through a mistaken construction by all parties of certain deeds of settlement and an act of Parliament relating thereto, taken a lease from the defendant of property which, by a proper construction of those instruments, was actually vested in himself at the time. There was no element of mistake or fraud. Lord Westbury, in giving an opinion sustaining the bill for relief, said: "The result, therefore, is that, at the time of the agreement for the lease which it is the ob-- ject of this petition to set aside, the parties dealt with one another under a mutual mistake of their respective rights.   * * *   It is said, *Ignorantia juris haud excusat;* but in that maxim the word *jus* is used in the sense of denoting general law, the ordinary law of the country. But when the word *jus* is used in the sense of denoting a private right, that maxim has no application. Private right of ownership is a matter of fact. It may be the result, also, of matter of law; but, if parties contract under a mutual mistake and misapprehension as to their relative and respective rights, the result is that that agreement is liable to be set aside as having proceeded upon a common mistake."

The decree entered was right, and will therefore be affirmed, with costs.            *Affirmed.*