MAYBORN, Plaintiff, v. CONTINENTAL CASUALTY COMPANY et,
Defendants.

Common Pleas Court, Trumbull County.

No. 58918.   Decided August 11, 1953.

Hoppe, Day & Ford, by Mr. Day, for plaintiff.
Evans, Chanson & Gentithes, by Mr. Gentithes and Mr. Meermans,
for defendants.

## OPINION

By BIRRELL, J.

The Plaintiff, L. L. Mayborn in this case, secured a contract with the U. S. Government for the construction of "damtenders" dwellings at Mosquito and Berlin Dams, which is dated May 5th, 1949. Previous to making his bid for this contract, he had submitted copies of the specifications to various contractors, including Defendant William M. Bushnell, for the construction of the plumbing work required under said contract. Bushnell had given him a written bid for the construction of such plumbing at $6,500.00. After receiving the notice that he had been awarded the general contract Mayborn advised Bushnell of such fact and that Bushnell's was the lowest bid for doing the plumbing work. He therefore requested Bushnell to enter into a sub-contract. Dispute was had between Mayborn and Bushnell as to the extent of the plumbing work, Bushnell claiming that he should not be required to do any excavating or back-filling other than within five feet of the building, Mayborn claiming that the plumbing work included both excavating and back-filling. On the refusal of Bushnell to sign a contract including excavating and back-filling, Mayborn secured an employee of Bushnell to sign the contract, and without further discussion with Bushnell on this particular point urged Bushnell to enter upon the job and proceed with the plumbing work which Bushnell did. At the same time Mayborn continued with the excavating and back-filling.

Bushnell's bid on the sub-contract included the requirement that bond in the amount of $6,500.00 be furnished. Although Bushnell proceeded with the work, he delayed the giving of bond until he desired the payment of a substantial amount ($2,500.00) on the contract. Mayborn had already paid Bushnel on the contract some $710.04 but refused to make further payment until bond was furnished. On August 6th., the parties, with Bushnell's attorney, met at the office of W. C. Gamble, agent for Defendant Continental Casualty Company of Chicago, and a bond was prepared, signed and presented to Mayborn whereupon Mayborn paid the $2,500.00 to Bushnell, and the contract continued. It appeared that Mayborn had been advised by the Government engineer on the job to secure a bond from his sub-contractor, and had urged Bushnell from the beginning to furnish a bond which Bushnell had delayed doing. After the bond was given the work on the contract continued and further substantial payments were made to Bushnell.

The contract required completion within 180 days from May 26th, 1949, which term would expire November 22nd., 1949. Delays on the part of Bushnell in completing various items of his work and in failing to do certain parts thereof in accordance with specifications, which delinquencies were pointed out by the Government engineers, caused Mayborn to fear that his completion of the contract would be delayed beyond the due date, and subject him to the penalty of $25.00 per day provided

in the contract for failure to complete the job on time. This fear caused Mayborn to urge Bushnell to complete his work more rapidly, and ultimately caused Mayborn on October 25th to cancel Bushnell's contract, secure another plumber and go forward with the completion of the job.

Notice of the delinquencies of Bushnell was given to Continental Casualty Company as early as August 31st., 1949, which Company denied liability upon their bond, and refused to take over and complete the contract. This notice, the conferences and refusal, all occurred before Mayborn himself dismissed Bushnell and undertook the completion of Bushnell's sub-contract.

This lawsuit was brought for the purpose of securing judgment against Bushnell and enforcing the liability for his delinquencies against the Bonding Company. The pleadings, among other matters, raise three points:

Who was the sub-contractor heretofore referred to as Defendant "Bushnell."

What was the contract between Plaintiff and said sub-contractor.

Should the bond which had been written to "United States of America" instead of to "Mayborn" be reformed as requested in the petition to change the obligee from the United States of America to Mayborn.

With reference to the identity of the sub-contractor during the period of this contract Defendant "Bushnell," used various names, or forms of names, in his proceedings all of which are set forth in the pleadings. There is no dispute that some sort of contract was entered into and was partially performed by the person known as "William M. Bushnell." William M. Bushnell claims and admits in his Answer that he was operating as the president of a corporation known as "The William M. Bushnell Plumbing and Heating Company." Proof was offered in evidence of the incorporation of such a company under date of December 31st, 1948, and it appears that such a company was in existence at the date of the offering of the bid to Mayborn by Bushnell, which bid was signed "William Bushnell, pres. Bushnell Plumbing and Heating Company" although not on corporation stationery. When Mayborn prepared his contract which he requested Bushnel to sign, this contract was prepared to "William Bushnell" but signed by the employee of Bushnell as "William Bushnell Plumbing Company, by Byron E. Mills," which signature (whether valid or not) was accepted by Mayborn without objection. The first checks of Mayborn to Bushnell, including the check of August 8th., for $2,500.00 were written to William Bushnell. After the bond was given the checks of September 15th., for $1,500.00 was written to William Bushnell Plumbing Company, and the last check of October 10th was written to William Bushnell and the Trumbull Plumbing Company. The Bond of Continental Casualty Company was written to the corporation under the name of "William M. Bushnell Company."

The carelessness of the parties with respect to title and proper designation of the capacity in which Bushnell appeared is very evident. There is no dispute respecting the fact that there was a contract, and that there was only one Corporation operated by Bushnell. This corporation was entitled "The William M. Bushnell Plumbing and Heating Company."

The attorney for Bushnell, in the preparation of Bushnell's bond, saw fit to give the name as "The William M. Bushnell Company," indicating likewise to the Bonding Company that the Corporation which gave the Bond and which had the contract was incorporated March 2nd, 1949. The check of August 8th for $2,500.00 was deposited in a so-called "special account" in The Union Savings and Trust Company bank under the name of "William Bushnell Plumbing and Heating Company, special account."

While there had been some misunderstanding apparently among the directors of the Corporation, and while the corporation had taken away from Bushnell the power to make withdrawals from the corporation account, it would appear that Bushnell still understood that he was transacting his business in the capacity of the Corporation. As far as the Plaintiff is concerned he was doing business with the man named "William M. Bushnell;" whether as an individual, or as president of a corporation known as "The William M. Bushnell Plumbing and Heating Company," or as President of a corporation known as the "William Bushnell Company" was not important to the Plaintiff. It is proper, however to designate "Bushnell" in his rightful capacity. The Court is inclined to the belief that the use of the name "William Bushnell Company" in the bond furnished by the attorney for the Company was as careless a designation as appears to be other of the designations used throughout the proceedings in this case. It should be noticed also that William M. Bushnell files an Answer personally claiming that he was acting in the capacity as, and that the contract was given to, "The William M. Bushnell Plumbing and Heating Company." The William M. Bushnell Plumbing and Heating Company fails to answer in this case, probably because its franchise was cancelled on October 25th, 1949 by the Secretary of State for failure to pay its franchise fee. Probably the fact of cancellation of its franchise was unknown to Mayborn at the date that he cancelled the subcontract. But the fact of the "decease" of said company may well have become a cause for such cancellation. It is difficult to explain the careless information given by this corporation's attorney at the time of securing of the bond. Further discussion on this point however will be noted hereafter. The conclusion of the Court is that the Corporation known as "The William M. Bushnell Plumbing and Heating Company" held the sub-contract in this case.

The second point for determination is the extent of the subcontract. As noted above, Bushnell refused to sign the subcontract for the plumbing work as long as it included excavating and backfilling. The fact that one of his employees, without authority from the Corporation, did sign such contract, does not necessarily bind the Corporation. It would seem, although denied by Bushnell, that he must have known of this signing by his employee for he admits that the copy of the paper so signed was in the files of the Corporation. And if he had knowledge, it would further seem that the entering upon and the continuing with the work of the subcontract raises the probability that the Corporation approved and endorsed the signature of this employee. It should be possible for a Corporation to adopt an unauthorized act of an employee by con-

senting and undertaking the work thereby contracted and the Corporation thereby be estopped from denying its liability thereunder. But considering the many careless and unreliable actions shown to have occurred and to have been habitual with "Bushnell" in this case, the Court has no better basis on which to assume that he did know of his employee's signature than that he paid no attention to it, or if he did know of it, knew also that it was made without authority.

On this subject, however, Bushnell may as readily claim that he went forward with the contract under the urging of Mayborn, supposing and believing that Mayborn was accepting and acceeding to his interpretation, that he had offered to do the plumbing work but not the excavating and backfilling. In fact he would have just as much right to believe that Mayborn was agreeing to his terms in urging him to go forward with the work, as Mayborn would have the right to believe that Bushnell was agreeing to Mayborn's terms as set forth in the written contract. Mayborn, however, should have known that a mere employee of a corporation, or even an employee of an individual, could not necessarily bind the corporation or the individual to some contract outside of the scope of the employment or authority of the employee. And with the refusal of Bushnell to agree to do the excavating and backfilling ringing in the ears of Mayborn, Mayborn could hardly claim that the minds of these parties had met merely because an employee who knew nothing, presumably, of his employers statements, and who signed without opportunity to consult his "boss," had been induced to sign a paper under the representations made by Mayborn alone. On this point I do not think that the position of Mayborn is any better or stronger than the position of Bushnell.

In fact the minds of these parties on that day had not met, and either of them in going forward with the contract had the right to believe that each was proceeding under his own offer. Since the burden rests upon Mayborn to prove his claim by a preponderance of the evidence, granting that the Court believes both of the parties statements to be of equal weight, I believe that Mayborn must fail for lack of preponderance of the evidence.

It may be assumed, of course, that both of these parties knew and understood the language of the government contract, and also the language of Bushnell's proposal, and of the suggested contract submitted by Mayborn to Bushnell. While the government contract includes the plumbing, drain, sewer and water supply systems under Sections 10 and 11, it is to be noted that the general requirements of the excavating and backfilling are included under Part 2 General Conditions 1 to General Conditions 16. And wherever reference is made to the manner in which certain portions of the sewer, drain or water supply systems are described, reference is always made to the General Conditions 1 et seq for the method of excavation and backfilling. The government specifications do not separate and define the duties of any one of the subcontractors. It sets forth the requirements of the general contractor in all respects. Should the general contractor desire to sublet portions of his responsibility it is for him, and not the Government, to determine

what portions have been sublet. In the absence of a specific contract between the general contractor and his subcontractor there may be a very bonafide dispute between them as to what responsibilities the subcontractor accepted. The offer of Bushnell under date of April 21st, mentions "confirming plumbing bid * * * according to specifications." This leaves the determination of what a plumbing bid is to, possibly, the customs of the trade. Here Bushnell, a plumber, testifies as to the customs, stating that they do not include excavations and backfilling, more than 5 feet from the buildings. There is no other testimony on this subject. The Court is not expected to know the customs and usages of the various plumbing contractors of this vicinity. Bushnell could have read the Government specifications, interpreted them in the light of the customs and usages of the plumbers, without understanding that it was his duty to accept the job of excavating and backfilling for installations. Under these circumstances the Court likewise feels that Bushnell's interpretation of the specifications with reference to excavating and backfilling must be accepted in the absence of a specific written subcontract on that point.

On the important question of reformation of the Bond, as previously mentioned, Bushnell had agreed to give a Bond. Mayborn had been so urging him and refused further payment until the Bond was furnished. In order to secure the payment Bushnell secured and delivered the Bond. The Bond was written to the United States of America instead of to Mayborn. Mayborn, upon receipt of the Bond, paid the money and continued to make further payments to Bushnell.

It is almost needless to state that Bushnell had no contract with the United States of America. It is also apparent that Bushnell had no other contract than the contract with Mayborn, a subcontract for the performance of certain work under Mayborn's contract with the United States of America. It is also apparent that the only contract mentioned to the Bonding Company and for which the Bonding Company was requested to give Bond was Bushnell's contract with Mayborn. It is also clear that Mayborn would not pay Bushnell until Bushnell complied with his offer to furnish the Bond, and that the Bond was given in compliance with Bushnell's offer to Mayborn, and for the purpose of securing payment upon the contract. All of the foregoing propositions are shown by clear and convincing evidence. It is also apparent that the Bond was arranged for and the information given to the Bonding Company by Bushnell's attorney, an officer of the Corporation, an attorney skilled in legal knowledge and versed in matters of contracts and Bonds. By some error the Bond was not made to Mayborn as it should have been made. No reason is indicated why it should not have as readily been written to Mayborn as to the United States of America, other than that Mayborn had suggested that he desired mention of his Government contract to be made in the Bond. This request on his part was, no doubt, important in so far as it designated the work in connection with the Bond and the subcontract as part of his general Government contract. It is apparent, therefore, that a mistake was made in the name of the obligee, and that such mistake is shown by clear and convincing evidence.

The question arises whether such a Bond may be reformed. That reformation of a surety Bond by Courts of Equity may be had has been determined in Ohio by the case of **Neininger v. States, 50 Oh St 394** which is frequently referred to as authority on this question.

Granting, therefore, that Courts of Equity have the power to reform such written instruments, the next question for consideration is whether such reformation may extend to the correction of the name of the obligee. Such reformation has been made in the following cases:

Gayle v. Hudson (1846) 10 Ala. 116: 14 Ala Reports 43 Name of "Hudson & Jones" may be reformed to "Hudson & James."

Bell v. Tangery (1847) 46 Ind. 49 Constable's name of Banning, reformed to Plaintiff's name of Bell, et al.

Archer v. McClure (N. Car. 1914) 81 S. E. 1081: Ann. Cas. 1916 C. 180.

2 Syl. "Reformation of Instruments—Mistake—Wrong name it being intended that a bond should be to the Plaintiffs in an action, with whom contract therefor was made, and by mutual mistake it being made to one who was their active agent in prosecuting the action, it will be reformed, though the loss has occurred, and the surety's principals have become bankrupt."

Wilson Supply Co. v. Fidelity & Casualty Co. (Ky. 1937) 110 S. W. 2d 1075.

Partnership's name reformed to individual's name.

**Neininger v. State (1893) 50 Oh St 394 at pp. 402-3.**

Collection of cases authorizing reformation of names of obligees. which are not unlike the present case.

Defendant, The Continental Causalty Company however claims that no reformation should be had because it intended to write the Bond to The United States Government and that reformation may be had only where the mistake is mutual. There is no question that Continental Casualty Company did write the Bond to The United States Government which was done without thought or clear understanding of the contract for which the Bond was given. Were the misunderstanding determinative of this question, among the foregoing authorities, no one would have prevailed in Court, because in each case the Sureties had made the same claim as does the casualty Company in the present instance. The examination of these various cases indicates that those Sureties had signed instruments to various named obligees who were not the parties to whom the obligations should have been given. Yet the Courts in each instance have found that a mistake, an obvious mistake, had occurred and granted relief.

Authorities for reforming other portions of Surety Bonds are as positive and certain of the right and duty of a Court of Equity to make such reformation as are the above specific Courts of their right to reform the names of the obligees to conform with the intention of the parties, and generally mention in their "dicta" that the Court's authority also extends to the reformation of the names of the parties."

Chapman v. Allen (Conn. 1788) 1 Am. Dec. 24; Smith's Admr. v. Wainwright's Admrs. (1852) 24 Ver. 95; Standard Oil Co. v. Century Indemnity Co. (1952) 105 F. Supp. 284.

In explaining "mutuality of mistake" in the case of Archer v. McClure, supra, the Court says at p. 1084:

"It would not be creditable to the indemnity company should we assume that it was engaging in so important a business transaction as the giving of a bond of indemnity in a suit without knowing what suit it was, and where it was pending. And again it may be said that it is immaterial to a defendant, who was named as obligee by mistake, as its main and only reliance for reimbursement was upon its co-obligors or the principals in the bond, and in that respect the bond is not changed. The defendant owes the money, and it would not be right if we should permit it to escape upon a mere technicality, or an inadvertence of the draftsman, or mistake of the parties as to the real name of the Plaintiff. The law is strongly against any such view. It does not regard the name of persons so much as it does the substance and actual identity of the agreement."

It must be assumed that the agent for Continental Casualty Company knew what he was doing when he bound his Surety Company as bondsman on the contract of Bushnell. Further evidence of carelessness or inattention on his part is shown by dating the contract the day before it was actually given, which does not recommend the agent's carefulness.

Of course Mayborn was careless in taking this sort of Bond when it was given to him. On the other hand he was not an attorney nor one skilled in reading or interpreting Bonds. Such a situation was met by the remarks of Judge Lynne in the case of Standard Oil Company v. Century Industrial Co. supra, at p. 291 with citation of cases:

"Reformation of the bond made Exhibit 3 to the complaint is not barred by negligence on the part of Alabama-Tennessee or anyone acting in its behalf. Great A. & P. Tea. Co. v. Engel Realty Co. 241 Ala, 236, 2 So. 2d 425: Snell v. Insurance Co., 98 U. S. 85, L. Ed. 52: Griswold v. Hazard, 141 U. S. 260, 11 S. Ct. 972, 35 L. Ed. 678."

and by Justice Harlan in the case of Snell v. Insurance Company, 98 U. S. 85; 25 L. Ed. 52: at p. 91 (55) (see p. 551):

"He trusted the insurance agents with the preparation of a written agreement which should correctly express the meaning of the contracting parties. He is not chargeable with negligence, because he rested in the belief that the policy would be prepared in conformity with the contract. As soon as he had a reasonable opportunity to consult Counsel, he discovered the mistake, and insisted upon the rights secured by the original agreement. A court of equity could not deny relief under such circumstances, without enabling the Insurance Company to obtain an unconscionable advantage, through a mistake, for which its agents were chiefly responsible."

Defendant, Continental Casualty Company, cites the cases of Stewart v. Gordon, 60 Oh St 176, and Mulby v. Dunham, 29 Oh Ap 51, which at 1 Syl and at 3 Syl respectively, approve the holding of the Neininger case that the evidence must be "clear and convincing" and "satisfactory." Such statements as are also adhered to in the more recent cases of Bellish v. C. I. T. Corp., 142 Oh St 36, 5 Syl and Greenfield v. Aetna Casualty v. Surety Co., 75 Oh Ap 122.

The cases of Wilson Machinery & Supply Co. v. Fidelity & Casualty Co. (Ky. 1937) 110 S. W. 2d 1075; Scaramone v. DeMatteo (Conn) 68 A. 2d 167; and Kelly-Dempsey Co v. Century Indemnity Co. 77 Fed. 2d 85; clearly explain the refusal of each Court to be convinced by "clear and convincing" evidence of the right of claimants to reformation.

In the Wilson case, Gordon and Green a partnership, of which Gordon knew the business, and Green had the money, made the bid, Green pulled out of the partnership before the bid was accepted. The contract was let to Gordon who in order to secure the Bond forged Green's name. The Court found this was not the act or Bond of the partnership.

In the Scaramone case the claimant desired reformation to interpret the Bond to guarantee payment of $1000.00 upon an attached car regardless of the amount for which it would sell at Sheriff's sale. The Court says at p. 169:

"The clause quoted above (p. 198 note 1) from the bond must be read as meaning that the Plaintiff attached as property of Diglio, a Dodge sedan of the value of $1,000.00, not as an agreement of the parties that the value of the interest of Diglio in the car amounts to that sum."

And in the Kelly-Dempsey case the property had already passed out of control of the principal of the Bond and the reformation contended far exceeded the regular conditions included in the usual terms of the policy.

It is evident that in no one of the foregoing citations was the evidence sufficiently "clear and convincing" to move the Court to reform the contracts.

In considering all of these matters including the presence of Mayborn at the time of the preparation and writing of the Bond, the absence of discussion with Mayborn by the Insurance agent to learn the fact of the subcontract, and likewise the absence of any representative of the United States of America which would indicate that the agent did not know or care to whom the Bond was written, there can be no question in the mind of the Court that it has been shown by clear and convincing evidence that a mistake has been made, that the Bond should have been to L. L. Mayborn, and that reformation should be granted.

The Continental Casualty Company is losing no more by being responsible upon a Bond to Mayborn that it would have lost had Bushnell's contract been to "The United States Government" for the reason that the evidence of Bushnell's default is the statements and inspections made by the engineers of the United States of America. They would have as unhesitatingly required completion of the contract in accordance with government specifications from Bushnell as they did require them from Mayborn.

While reforming the name of the obligee on this Bond, it is as "clear and convincing" also that the name of the principal should have been written as "The William M. Bushnell Plumbing and Heating Co.," instead of "The William M. Bushnell Company," and that such reformation should also be granted. Probably in a minimum of cases could such a maximum of carelessness in comparatively obvious matters have occurred on the part of the principal and the Casualty Company.

As to the amount of the default of Bushnell the Court, in examining

the claims of Mayborn on this point, has deducted from the general claim (plf. Ex. 32) made to the Continental Casualty Company the amounts therein charged by Mayborn for excavating and backfilling, leaving a balance of $5,929.12 as the amount which Mayborn has been damaged by reason of the default of Bushnell. Judgment may be rendered in such amount, and reformation granted as above set forth.