LAWRENCE COUNTY BANK *v.* ARNDT.

Opinion delivered June 22, 1901.

1. PROMISSORY NOTE—FORM OF SIGNATURE—PAROL EVIDENCE.—Where the only evidence on the face of a promissory note that the persons signing did not intend to bind themselves personally was the affix to their signatures of some designation of agency, as by signing themselves, respectively, as president, vice president, secretary and treasurer, without stating for whom or for what company they were acting, they are liable personally, and cannot, as a defense, show by parol evidence that they intended to bind a certain corporation, for which they were acting. (Page 410.)

2. MUTUAL MISTAKE OF LAW—REFORMATION.—Where a note payable to a bank, given for the indebtedness of an incorporated company, was, by direction of the president and cashier of the bank, signed by the officers of such company, followed by the official designation of each officer, and the bank officials at the time represented to

such signers that they were not personally liable, and the note was executed and accepted as the obligation of the company alone, equity will reform the note, to correspond to the intention of the parties, and such intention may be shown by parol evidence. (Page 412.)

Appeal from Lawrence Circuit Court in Chancery.

FREDERICK D. FULKERSON, Judge.

*Coffin & Ponder,* for appellant.

The titles added to the signatures of appellees are not surplusage; and, the note not showing that the signatures were meant to bind the company as principal, the appellees are individually liable. 61 Ind. 241; 26 Minn. 43; 87 N. Y. 250; 65 Ind. 27; Tied. Comm. Pap. § 123; 98 Mass. 101; 2 Conn. 260; 2 Wheat. 56; 122 Mass. 67; 5 Denio, 517; 38 Oh. St. 442; 6 Yerg. 479; 88 Ill. 219; 1 Dan. Neg. Inst. § 305; 56 Ga. 258; 34 Vt. 402; 62 Ark. 391. The note uses the expression, "we or either of us promise to pay," and is a personal obligation. Tied. Comm. Pap. § 124; 10 Oh. St. 444; 4 Metc. (Ky.) 296; 3 W. Va. 285; 71 Ia. 581; 43 Mich. 376; 9 N. H. 263; 12 Gray, 474; 78 Me. 390; 36 Ark. 296. If appellees had intended to bind the company, they should have designated it in some way as a party to the note. 105 U. S. 416; 12 Mass. 237; 60 Ind. 119; 90 N. C. 417-421. Parol evidence is not admissible to vary the terms of the written contract sued on and to show the representative character of the makers. 1 Am. & Eng. Enc. Law (2d Ed.), 1051-3; 3 Denio, 604; 21 Wend. 101; 9 M. & W. 79; 68 Me. 87; Tied. Comm. Pap. § 123; 35 Conn. 131; 1 Cal. 365; 1 McAll. 20; 75 Ga. 56; 109 U. S. 194; 5 Gray, 567; 50 Ark. 395; 35 Ark. 156; 13 Ark. 125; 4 Ark. 179; 15 Ark. 543; 16 Ark. 511; 45 Ark. 177; 62 Ark. 391.

*Joseph W. Phillips, S. D. Campbell* and *Jasper N. Beakley,* for appellees.

Equity had power to correct the mistake made in omitting the name of the principal. 4 Am. & Eng. Enc. Law (2d Ed.), 210; 11 Pet. 71; 13 Ark. 139; 49 Ark. 34. Parol evidence is admissible to correct mutual mistakes. 4 Am. & Eng. Enc. Law (2d Ed.), 150, 153; 27 Ark. 512; 139 U. S. 568; 46 Ark. 131; 51 Ark. 434; 52 Ark. 65; 55 Ark. 115; 54 Ark. 97; 62 Ark. 99; 5 Wheat. 327. *Cf.,* also, 67 Ark. 551; 65 Ark. 53; Fetter, Eq. 127.

*J. W. Phillips, J. N. Beakley* and *S. D. Campbell,* for appellees on motion to reconsider.

Parol evidence was admissible to explain the mutual intention of the parties. Story, Eq. Jur. §§ 153-156; 3 Greenleaf, Ev. 360; 115 U. S. 634; 50 Am. St. 674. *Ignorantia juris non excusat* does not apply. Bish. Cont. § 707; 8 Wheat. 174; 141 U. S. 260; 13 Ark. 138; 49 Ark. 32; 40 Am. St. Rep. 674; 52 L. R. A. 712; 58 S. W. 207; 60 S. W. 311; Fetters, Eq. 127; 15 Am. & Eng. Enc. Law, 734; Pom. Eq. Jur. § 843. Between original parties promissory notes are subject to reformation. 4 Am. & Eng. Enc. Law, 153; 15 Ark. 15; 20 U. S. C. C. A. 287; 104 U. S. 93; 29 S. W. 882; 34 Am. St. Rep. 433; 20 L. R. A. 705; 72 Am. St. Rep. 291. Original want of consideration follows new note given in substitution. 15 Ark. 465. Want of consideration may be shown by parol. 53 Ark. 4; 26 Ark. 449; 66 Ark. 521. Appellant was estopped by representations of its officers and agents made at the time of execution of note. 65 Ark. 51; 34 Am. St. Rep. 107; 56 Am. Rep. 106; 47 Am. Rep. 182.

*Chas. Coffin, H. L. Ponder* and *J. C. Hawthorne,* for appellant in reply.

Mistakes of law cannot be corrected. 45 Ark. 175. To correct a written instrument evidence must be clear and free from doubt. 14 Ark. 487; 36 S. W. 122; 18 S. W. 928; 25 S. W. 1108; Kerr, Fraud and Mistake, 428; 46 Ark. 176; 2 Pom. Eq. Jur. § 843; 41 Ark. 499; 49 Ark. 429, 430. If any mistake at all, it was a mistake at law, and equity offers no relief. 56 Ark. 322; 40 S. C. 92; 15 Am. & Eng. Enc. Law, 637; 4 Rich. Eq. 342; 35 S. C. 360; 13 Ark. 135; 15 Ark. 15; 1. Am. & Eng. Dec. Eq. 138-236; 4 Am. & Eng. Dec. Eq. 480.

BUNN, C. J. This suit was instituted on a promissory note on the 16th February, 1899, and on the pleadings and testimony in the case the cause was transferred to equity, judgment was rendered for the defendants, and plaintiff appealed.

The plaintiff is an incorporated bank, doing business at Walnut Ridge, in Lawrence county in this state, and the defendants are citizens of said place, who made their promissory note to the bank, of which the following is a copy, to-wit:
"$1,540.

"Ninety days after date we or either of us promise to pay to the Lawrence County Bank fifteen hundred and forty dollars, negotiable and payable at the Lawrence County Bank, Walnut Ridge, Ark., for value received, with interest at ten per cent. per annum after maturity until paid. The drawers and indorsers severally waive presentation for payment, protest and notice of protest, and nonpayment of this note.

[Signed]            "H. ARNDT, President,
                    "J. M. PHELPS, Vice President,
                    "BENJ. F. GRAFF, Secretary,
                    "S. C. DOWELL, Treasurer."

Payment of interest to November 1, 1898, amounting to $82, was indorsed on the note. No other payments were made, and the prayer was for judgment for the $1,540, and interest from 1st November, 1898.

The defendants answered, averring that the note was in fact but a renewal note of two pre-existing notes aggregating the same amount, which the Walnut Ridge Manufacturing Company, another corporation of the same place, owed said bank, and that the defendants executed the same for no other consideration than to take up and renew said two notes and old indebtedness, and that they did not execute the note sued on in their individual capacities, nor was it the intention of the parties to it that they should be held individually liable for the same, but that, on the contrary, as the terms set opposite their signatures indicate, they executed the same as officers and directors of said Manufacturing Company, to bind said company alone; that the note was executed at the instance and request of said J. M. Phelps, who was the president of said bank, and at the same time vice president of said company, and that it was perfectly understood among them all at the time, and so expressed, that the note was to be regarded as the obligation of the Manufacturing Company, executed by the defendants as its officers and agents, and not otherwise. The two notes, of which the note sued on is claimed to be a renewal, appear in the record as having been similar in language to the one sued on, and signed by persons designated as president and treasurer, and others writing without official designation. The testimony in the case goes to show that the consideration of all these notes was an indebtedness originally of the Manufacturing Company, evidenced by note and renewed from time to time from an indefinite time past.

The sole question necessary to be considered in this case is, whether a note expressed in the language of the one sued on, and signed as it was, is subject to be explained by parol testimony.

It will be observed that the Walnut Ridge Manufacturing Company is nowhere referred to in the body of the note as the payer or obligor; nor is it referred to, in connection with the signers of the note, as a company of which they were officers and directors, nor otherwise. There is, in fact, nothing on the face of the note, nor connected with the signatures, which has any reference to said Manufacturing Company, which is sought to be made the obligor by the defendants. Therefore a suit on the note as this is could have no reference to said company, unless by extraneous averments, as made in defendants' answer herein.

The rule, as laid down in all the works of the text writers, and supported by all the decisions (with a few exceptions, and they only apparently exceptions), is that such a note is the note of the signers, individually, and not of the body or company they claim to represent, and that parol evidence is not admissible to explain the intention of the parties, and show the same to have been different from that expressed in the language of the note itself. In stating the principle, it may be well, however, to say that any reference, however slight, to the alleged obligor company in the body of the note, or in the official designation of the signers, would be sufficient to let in proof of the real intention of the parties, but the difficulty in this case is that there is nothing on the face of the note, or connected with the signatures, to indicate that the Manufacturing Company had any connection with the transaction whatever. That being true, parol testimony to show such connection is inadmissible under the rule, however hard that rule may appear to be; and the rule is in equity the same as at law. Tiedeman, Commercial Paper, § 123, and note thereunder, and corresponding sections in Daniel, Neg. Inst.; Randolph on Commercial Paper, and all text writers on the subject.

The case having been determined in the court below contrary to this rule, the decree is reversed, with directions to render judgment for the plaintiff.

ON REHEARING.

Opinion delivered December 7, 1901.

BATTLE, J. The appellees ask for a rehearing on the following among other grounds, to-wit:

"Appellees believe the court overlooked the fact that the question of admissibility of parol testimony was brought into this case, not as a direct defense to the note, but by their cross-complaint against appellant seeking a reformation of the note sued on to accord with mutual intent of the appellant and appellees at the time of the execution of said note, and that the failure to express the words showing on the face of the note that it was the obligation of the Walnut Ridge Manufacturing Company was a clerical mistake of the appellant, as well as of the appellees; that such mistake was induced by, and was the fault of, the appellant; that appellant's officers and agents induced appellees to sign said note by expressly representing to them at the time that it was the obligation of the Walnut Ridge Manufacturing Company, and not the obligation of appellees individually; that the note has always been in the hands of the original payee, and nothing has intervened to prejudice the rights of appellant by reason of such note being reformed to express the mutual intent; that the evidence in the record, as well as the cross-complaint, shows the foregoing facts."

Appellees, in their answer filed in this cause in the circuit court, alleged that the note sued on was given in satisfaction of the indebtedness of the Walnut Ridge Manufacturing Company, and for the purpose of evidencing such indebtedness, and that they were not personally liable for the same. After answering in this manner, they filed an amended answer, making the same a cross-complaint, "alleging that, at the time of the execution of the note, it was agreed and understood between the plaintiff and the defendants, as the officers of the Walnut Ridge Manufacturing Company, that the note should be executed as the obligation of the company, and not as the obligation of the defendants individually, and at the time it was so understood by all the parties, and the note was executed by the defendants in their capacity as such officers, and as the obligation of said company, the word *as* between each individual name of the signer and the name designating his official capacity, and the words *Walnut Ridge Manufacturing Company* after the designation of the official capacity of each signer, being omitted by clerical error and mutual mistake of all the parties to the instrument."

The cross-complaint prayed that the cause be transferred to equity, that the Walnut Ridge Manufacturing Company be made a

party, and that the note be reformed so as to express the meaning and intent of the parties at the time of its execution.

The cause was transferred, without objection, and the Walnut Ridge Manufacturing Company entered its appearance.

The evidence adduced at the hearing "showed that the note was drawn in its present form by the officers of the bank, or at their instance, before presentation for signing, and was carried by J. M. Phelps, as president of the bank, and by Dolph Sloan, as its cashier, to the makers of the note, and that the bank officers directed the makers to sign for the Walnut Ridge Manufacturing Company with simply the official designation after each name, in form as the same now appears, representing to the signers at the time that they were not personally liable for it, but that it was the obligation of the company."

The court found that the note sued on was given for the indebtedness of the Walnut Ridge Manufacturing Company to the bank, that appellees did not assume the indebtedness, it being the understanding of appellant and appellees that the signing of the note by appellees was in their official capacity, and that the makers were not individually or personally liable; and rendered a decree in favor of appellees, and a decree in favor of appellant against the Manufacturing Company for the balance due on the note.

The question presented by the motion for rehearing is, was it the duty of the circuit court to reform the note?

Authors and courts have found it difficult to formulate a rule according to which courts of equity relieve against mistakes of law. Chief Justice Marshall, in *Hunt* v. *Rousmanier,* 8 Wheat. 174, 215, said: "Although we do not find the naked principle that relief may be granted on account of ignorance of law asserted in the books, we find no case in which it has been decided that a plain and acknowledged mistake in law is beyond the reach of equity."

After a review of the cases, Judge Story says: "We have thus gone over the principal cases which are supposed to contain contradictions or exceptions to the general rule that ignorance of law with a full knowledge of the facts furnishes no ground to rescind agreements or to set aside solemn acts of the parties. Without undertaking to assert that there are none of these cases which are inconsistent with the rule, it may be affirmed that the real

exceptions to it are very few, and generally stand upon some very urgent pressure of circumstances. The rule prevails in England in all cases of compromises of doubtful and perhaps in all cases of doubted rights, and especially in all cases of family arrangements. It is relaxed in cases where there is a total ignorance of title, founded in the mistake of a plain and settled principle of law, and in cases of imposition, misrepresentation, undue influence, misplaced confidence, and surprise. In America the general rule has been recognized as founded in sound wisdom and policy, and fit to be upheld with a steady confidence. And hitherto the exceptions to it (if any) will be found not to rest upon the mere foundation of a naked mistake of law, however plain and settled the principle may be, nor upon mere ignorance of title founded upon such mistake. It is matter of regret that in the present state of the law it is not practicable to present in any more definite form the doctrine respecting the effect of mistakes of law, or to clear the subject from some obscurities and uncertainties which still surround it. But it may be safely affirmed upon the highest authority, as a well established doctrine, that a mere naked mistake of law, unattended with any special circumstances as have been above suggested, will furnish no ground for the interposition of a court of equity ; and the present disposition of courts of equity is to narrow, rather than to enlarge, the operation of exceptions." 1 Story's Eq. Jurisprudence (13th Ed.), §§ 137, 138.

Professor Bispham says: "The true conclusion, as to the general rule, would seem to be that equity will not interfere in the case of a pure mistake of law; but that any additional circumstances will readily be laid hold of by the court, as constituting sufficient grounds for interposition. Thus, where ignorance of the law exists on one side, and that ignorance is known and taken advantage of by the other party, the former will be relieved. More particularly will this be so if the mistake was encouraged or induced by misrepresentation of the other party." Bispham, Equity (5th Ed.), § 188, and cases cited.

In Pomeroy's Equity Jurisprudence it is said: "Whatever be the effect of a mistake, pure and simple, there is no doubt that equitable relief, affirmative or defensive, will be granted when the ignorance or misapprehension of a party concerning the legal effect of a transaction in which he engages, or concerning his own legal rights which are to be affected; is induced, procured, aided, or accom-

panied by inequitable conduct of the other parties. It is not necessary that such inequitable conduct should be intentionally misleading, much less that it should be actual fraud; it is enough that the misconception of the law was the result of, or even aided or accompanied by, incorrect or misleading statements or acts of the other party. When the mistake of law is pure and simple, the balance held by justice hangs even; but when the error is accompanied by any inequitable conduct of the other party, it inclines in favor of the one who is mistaken. The scope and limitations of this doctrine may be summed up in the proposition that a misapprehension of the law by one party, of which the others are aware at the time of entering into the transaction, but which they do not rectify, is a sufficient ground for equitable relief. A court of equity will not permit one party to take advantage and enjoy the benefit of any ignorance or mistake of law by the other, which he knew of and did not correct. While equity interposes under such circumstances, it follows *a fortiori* that when the mistake of law by one party is induced, aided, or accompanied by conduct of the other more positively inequitable, and containing elements of wrongful intent, such as misrepresentation, imposition, concealment, undue influence, breach of confidence reposed, mental weakness, or surprise, a court of equity will lend its aid and relieve from the consequences of the error. The decisions illustrating this general rule are numerous, and it will be found that many of the cases in which relief has been granted contained, either openly or implicitly, some elements of such inequitable conduct." 2 Pomeroy, Eq. Jur. (2d Ed.), § 847, and cases cited.

In *Snell* v. *Insurance Company*, 98 U. S. 85, the syllabus is as follows: "A., a member of the firm of A., B. & Co., who were owners of cotton, communicated the facts touching its ownership, situation, value, and risks, so far as he knew them, to C., a duly accredited agent of an insurance company; and thereupon the company, through C., entered into a verbal agreement with A., acting for and on behalf of the firm, to insure for a certain period the cotton for its whole value against loss by fire, at a premium which was subsequently paid to the company. A. assented that the insurance should be made in his name, upon the representation and agreement of C. that the entire interest of the firm in the cotton would thereby be fully protected. The cotton was burnt within the specified period. The policy was then issued and de-

livered to A., who, being at once advised by his attorneys that it in terms covered his interest, but not that of the firm, forthwith requested the company to correct it, so that it should conform to the agreement. The company having declined to do so, A., B. & Co. filed against it this bill, praying that the policy be reformed, and that the value of the cotton be awarded to them. *Held,* 1. That the acceptance of the policy was not such as waived any right of A., B. & Co. under the agreement covering their interest in the cotton, which A. in their behalf had made with the company, and that they are entitled to the relief prayed for. 2. That a mere mistake of law does not, in the absence of other circumstances, constitute any ground for the reformation of a written contract." In that case the court said: "In the case under consideration, the alleged mistake is proved to the entire satisfaction of the court. It is equally clear that the assent of Keith to the insurance being made in his name was superinduced by the representation of the company's agent that insurance in that form would fully protect the interest of the firm in the cotton. We assume, as we must from the evidence, that this representation was not made with any intention to mislead or entrap the assured. It is, however, evident that Keith relied upon the representation, and, not unreasonably, relied also upon the larger experience and greater knowledge of the insurance agents in all matters concerning the proper mode of consummating, by written agreement, contracts of insurance according to the understanding of the parties. He trusted the insurance agents with the preparation of a written agreement which should correctly express the meaning of the contracting parties. He is not chargeable with negligence, because he rested in the belief that the policy would be prepared in conformity with the contract. As soon as he had a reasonable opportunity to consult counsel, he discovered the mistake, and promptly insisted upon the rights secured by the original agreement. A court of equity could not deny relief under such circumstances, without aiding the insurance company to obtain an unconscionable advantage through a mistake for which its agents were chiefly responsible. In all such cases, there being no laches on the part of the party, either in discovering and alleging the mistake, or in demanding relief therefrom, equity will lay hold of any additional circumstances, fully established, which will justify its interposition to prevent marked injustice being done. *Wheeler* v. *Smith,* 9 How. 55."

In *Griswold* v. *Hazard*, 141 U. S. 260, "one Durant, a citizen and resident of New York, was arrested under a writ of *ne exeat* while temporarily at Newport, Rhode Island. To obtain a release from custody under the writ, he executed a bond, with Griswold and Bradford as sureties, the condition of which was that Durant should 'abide and perform the orders and decrees of the supreme court of the state of Rhode Island in the suit in equity of Isaac P. Hazard and others against the said Durant,' then pending in said court. In that suit a decree was, fourteen years afterwards, obtained for a very large sum; and thereupon an action at law was brought on the bond against Griswold, and a judgment recovered. Pending this common law action on the bond, bills in equity were filed by Griswold for an injunction to restrain the proceedings at law. It was alleged in these bills that Griswold 'had intended to sign, and believed at the time that he signed, a bond which simply bound him for the appearance of Durant, and that its execution in its actual form was the result of mistake. The supreme court held (reversing the decree below) that the alleged mistake was clearly established by the proofs, that under the circumstances Griswold was entitled to relief against the mistake of law, and that the action on the bond should be perpetually enjoined." The court said: "There was no mistake as to the mere words of the bond; for it was drawn by one of Hazard's attorneys, and was read by Griswold before signing it. But according to the great weight of the evidence, there was a mistake, on both sides, as to the legal import of the terms employed to give effect to the mutual agreement. In short, the instrument does not express the thought and intention which the parties had at the time of its execution. And this mistake was attended by circumstances that render it inequitable for the obligees in the bond to take advantage of it. The instrument was drawn by one of Hazard's attorneys, and was presented and accepted as embodying the agreement previously reached. Griswold was unskilled in the law, and took the word 'perform' as implying performance in the sense of Durant's becoming amenable to the process of the court. He had no reason, unless the recollection of Gray, Durant, Van Zandt and himself as to what occurred is wholly at fault, to doubt that the bond expressed the real agreement; especially if he heard Van Zandt's statement to Durant, when the latter was about to sign the bond, that it 'was, in effect, a bail bond.' A court of equity ought

not to allow that mistake, satisfactorily established and thus caused, to stand uncorrected, and thereby subject a surety to liability he did not intend to assume, and which, according to the decided preponderance of the evidence, there was at the time no purpose to impose upon him. While it is laid down that 'a mere mistake of law, stripped of all other circumstances, constitutes no ground for the reformation of written contracts;' yet 'the rule that an admitted or clearly established misapprehension of the law does create a basis for the interference of courts of equity, resting on discretion and to be exercised only in the most unquestionable and flagrant cases, is certainly more in consonance with the best considered and best reasoned cases upon this point, both English and American.' "

In the case under consideration the note sued upon was prepared by the cashier of the bank, and was signed by the makers in the manner directed by him, upon the representation made by him to the effect that they would not be individually liable, and that the note as signed was the obligation of the Manufacturing Company. They relied upon such representation, and they did not act unreasonably in so doing, because his vocation and experience were such as to enable him to better understand how such paper should be drawn and executed to accomplish the desired result, and to express the obligation the makers thereof thereby intended to assume. They and the bank believed that the note was not their individual obligation, but the note of the Manufacturing Company. As evidence of this fact, each appended to his signature the name of the office he held in the Manufacturing Company. The conduct of the agents of the bank superinduced this mistake, and they accepted the note as the obligation of the Manufacturing Company. Under such circumstances, a court of equity cannot deny relief without aiding the bank to take an unconscionable advantage of a mistake for which its agents were chiefly responsible; and it is the duty of the court to grant relief, the note still being the property of the bank.

The decree of the circuit court is affirmed.

BUNN, C. J., (dissenting). This is a suit originally on the renewal promissory note mentioned in the opinion of the majority of this court, and was at law. While pending on the law side, the defendants filed their answer, in which their defense was, mainly,

S C—27

that the consideration of the note was in fact money borrowed for the use of the Manufacturing Company, by the officials thereof, who signed the two original notes in 1892, and, of course, was the consideration of the renewal note sued on. Most of the testimony in the case was for the purpose of showing this to be a fact; and, this being established, it was seemingly thought to be an easy matter to conclude that the Manufacturing Company alone was the real maker of the notes. The taking of so much proof to establish this point was a work of supererogation, for it will not be questioned that the consideration of the notes was for the use of, and was used in, the business of the Manufacturing Company. But, all that being admitted, it does not follow that appellees are not individually bound, and that they alone are bound upon the note as written. Indeed, this conclusion seems to have forced itself upon the appellees; and hence their amended answer and cross-bill, and motion to transfer, which was granted. The additional defense set up in the amended answer and cross-bill is that, in the first place, the Manufacturing Company is solvent; and then, immediately following, they say that it would be an irreparable injury to them if the courts should compel them to pay off the note sued on, and this is one of the equitable grounds upon which they are permitted to seek relief in equity.

But it will strike the disinterested reader as passing strange that, if the appellees are made to pay the note, the injury to them will be irreparable, since they are the sole managers and controllers of the company, and have it within their power to appropriate its assets (and it has sufficient assets if solvent, as they say it is) to the payment of its debts, and can thus readily indemnify themselves for any moneys they may pay out for the company. This seems to be a matter where the allegations are not only too much, but where they are conflicting with each other.

The other ground for equitable relief is set up in their answer and cross-bill, upon which they ask a reformation of the note sued on, so as to make it express the real intention of the parties, and thereby let them out of the liability which appears on the note as written. The proof they adduce goes to show that J. M. Phelps, as president of the plaintiff bank, perfectly understood that these persons who signed the note (appellees) were not personally liable, and that it was not the intention of any of the parties that they were not to be held personally liable

at all. The plaintiff bank is thus brought in to show that the mistake in signing the note as it was signed was a mutual mistake. The principal and the important evidence on this point is the testimony of J. M. Phelps himself, who, appellees say, was president of the bank, and spoke and acted for it, and bound it by his acts. The evidence of Phelps is really of little importance in itself, and moreover he was one of the obligors on the original notes, and was the vice president of the Manufacturing Company, and one of the signers of the note sued on, and, in so far as his evidence may tend to the benefit of appellees, it also tends to benefit himself personally.

He is not, therefore, the representative of the bank in a matter like this. The evidence on the part of the appellees was intended to show that the note was intended to be executed so as to make only the Manufacturing Company bound for its payment. That is, the effort is to abrogate two well-established rules; one of law, to the effect that oral testimony is inadmissible to vary a written contract, or, more properly speaking, to make this case an exception to the rule. The prayer of the appellees, also, if granted, is a violation of a business rule, which by usage has become almost as binding as law itself. That is, a note or other obligation to make payment, with only one obligor, is not bankable paper. If these appellees, who signed the note, are to be released from their individual obligations, and the obligations are thus to be cast upon the company, then the bank officials would be regarded as very careless and incompetent trustees to manage the affairs of the bank for the benefit of stockholders and depositors and other persons interested in the bank. The question is, is oral testimony admissible, on any kind of showing, to bring about such a result as this in any given transaction? It is a question, not so much what is determined by the testimony of witnesses, but whether or not (if they can say no more) they will be permitted to swear at all to accomplish such a purpose as this. The courts, in my opinion, should hold firmly to the rule, and suffer a modification or variance of it only in the extremest cases; and this case to me is far from coming in the category of the exceptions sometimes held permissible in the courts.

The complaint is not, after all, that Mr. Phelps wrote differently from what was intended, but it is that the words "as," before the respective official titles, and "of the Manufacturing Company,"

after these titles, were not inserted, and the note is asked to be reformed, so as to show the intent that would have been truly expressed if these omitted words had been included. There is no testimony whatever that Phelps, as president of the bank or otherwise, influenced the signing of the notes as they were signed. That was altogether a work of the appellees themselves. Phelps did not stand by and cause them to sign as they did. The manner of signing the note perfectly conformed to all that he said to them on the subject.

The doctrine of the courts and jurists narrows the cases in which ignorance of law may be relieved against in equity down to such a small number that it is confessedly impossible to state any general rule on the subject. This restrictive scope of the exception to the general rule—for that is all that it is—cannot be better illustrated than by a close examination of the cases cited by the court in support of its decree in this case.

In the case of *Snell* v. *Insurance Company*, 98 U. S. 85, "A., a member of the firm of A., B. & Co., who were owners of cotton, communicated the facts touching its ownership, situation, value, and risk, so far as he knew them, to C., a duly accredited agent of an insurance company; and thereupon the company, through C., entered into a verbal agreement with A., acting for and on behalf of the firm, to insure for a certain period the cotton for its whole value against loss by fire, at a premium which was subsequently paid to the insurance company. A. assented that the insurance be made in his name, upon the representation and agreement of C. that the entire interest of the firm in the cotton would thereby be fully protected. The cotton was burnt within the specified period. The policy was then issued and delivered to A., who, being at once advised by his attorney that it in terms covered his interest, but not that of the firm, forthwith requested the company to correct it, so that it should conform to the agreement. The company having declined to do so, A., B. & Co. filed against it this bill, praying that the policy be reformed, and that the value of the cotton be awarded to them. *Held*, 1. That the acceptance of the policy was not such as waived any right of A., B. & Co. under the agreement covering their interest in the cotton, which A. in their behalf had made with the company, and that they were entitled to the relief prayed for. 2. That a mere mistake of law does not, in the absence of other circumstances, constitute any ground for the

reformation of a written contract." The firm was no party to the writing purporting to express the contract between their agent, A., and the·agent of the insurance company, until a· delivery and acceptance of the same by the said agent, A., and it appears that, immediately upon its being nominally delivered to him, A. examined it through his attorney, and found it defective and not in conformity with their verbal agreement, and the firm requested the company to make the proper correction, which it, with right, declined to do. The written policy was never accepted, it having been rejected in a reasonable time after presentation for acceptance or rejection, for that is the meaning of it. There was therefore no mistake of law, but a simple neglect or fraud on the part of the agent of the insurance company in writing up the policy to meet the agreement of the parties, or bad faith in the company in attempting to cheat the firm by a trick,—a question of fact; for the cotton was insured for its whole value, and we infer that the full premium was paid to the insurance company.

In *Griswold* v. *Hazard,* 141 U. S. 260, "one Durant, a citizen and resident of the state of New York, was arrested under a writ of *ne exeat,* while temporarily at Newport, Rhode Island. To obtain a release from under the writ, he executed a bond, with Griswold·and Bradford as sureties, the condition of which was that Durant should abide and perform the orders and decrees of the supreme court of the state of Rhode Island in the suit in equity of Isaac P. Hazard and others against the said Durant, then pending in said court. In that suit a decree was, fourteen years afterwards, obtained for a very large sum for plaintiff; and thereupon an action at law was brought on the bond against Griswold, and judgment recovered. Pending this common law action on the bond, bills in equity were filed by Griswold for injunction to restrain the proceeding at law. It was alleged in these bills that Griswold had intended to sign, and believed at the time that he signed, a bond which simply bound him for the appearance of Durant, and that its execution in its actual form was the result of mistake. The supreme court held (reversing the decree below) that the alleged mistake was clearly established by the proofs; that under the circumstances Griswold was entitled to relief against the mistake of law; and that the action on the bond should be perpetually enjoined. The court said there was no mistake as to the mere words of the bond; for it was drawn by one of Hazard's attorneys, and was

read by Griswold before signing it. But, according to the great weight of evidence, there was a mistake, on both sides, as to the legal import of the terms employed to give effect to the mutual agreement. In short, the instrument does not express the thought and intention which the parties had at the time of its execution. And this was attended by circumstances that render it inequitable for the obligees in the bond to take advantage of it. The instrument was drawn by one of Hazard's attorneys, and was presented and accepted as embodying the agreement previously reached. Griswold was unskilled in the law, and took the word 'perform' as implying performance in the sense of Durant's becoming amenable to the process of the court." In other words, he thought he was signing a bail bond for the personal appearance of Durant in the court, and not a bond to abide the judgment of the court on the matter in litigation. The attorney on the opposite side had caused him to sign a bond of the latter class, instead of a mere bail bond, either by his own want of skill, negligence or wilful fraud, but as the court, in effect, found, by the mistake also of the attorney as to the legal effect of the bond written by him. Durant was arrested on his landing at Newport on the same day the writ was issued, and hurried at once to jail. His friends, together with the plaintiff's attorneys, assembled at the jail about 12 o'clock at night of the same day, it being Saturday, and the matter was discussed as to how he could be released from jail, so as to be permitted to return to New York on urgent business. The writ from the court commanded the sheriff to make the arrest, and "to take bail from Durant in the sum of $53,735, conditioned that he would not go or attempt to go into parts beyond the state without leave of the court." The sheriff had no authority to demand from Durant any bond having a different effect. The parties at the jail had all assembled there to arrange for the release of Durant from the jail. Nothing else seems to have been contemplated. Griswold was a stranger to Durant, but was induced to sign the bond by his nephew, who was a friend of Durant. A reading of the full statement of the case and the language of the decision, alone, can give the best understanding of the real meaning of the decision. The bond, as written, did not comply with the order of the court embraced in the writ, and was not such as the sheriff was really authorized to take. His authority was to take bail and release, and not to take a supersedeas or other bond binding the bondsmen to abide the judg-

ment for the debt.  Griswold signed what he supposed was the proper bail bond, written out by attorneys for plaintiff; and really there was some question that the bond was not in fact à mere bail bond for the appearance of the principal in court, and that he would not depart the state without the leave of the court.  It was held that the bond be reformed according to the understanding of the parties at the time of its execution.  To insist upon the liability of the bondsmen for the debt was simply an evidence of the fraudulent intent and unconscionable desire of the plaintiff.  There does not appear to have been any mistake of law on the part of Griswold.  He simply signed it, not dreaming it was anything but a bail bond, as to give bail was what they had all assembled at the jail at that hour of the night to do, and nothing else.

The text writers cited in the opinion all agree that a mere mistake of law cannot be relieved against, but that, in rare cases, where one is misled by the negligence, fraud or imposition of the opposite party to make the mistake of misconstruing and thereby of signing a paper not expressing his meaning at the time, he may have relief in equity.

But what is the case at bar?  Is it such that any of these cited cases are applicable at all?  Let us see.  It is, or (since there is no testimony on the subject) it may be, the custom of banks in dealing with these weak corporations, especially when starting business, to require their notes and other obligations to be signed by the managers of such concerns; for in no other way can the rules of banking be observed.  And it may be the rule to require these persons to annex their official titles respectively, not to show that it is paper of the concern, but, as to future holders, that these persons were in control of the concern's offices, and therefore would be the more likely to so manage to honor the paper when presented for payment, seeing that, if not so honored, they were liable themselves.  That is probably the rule, and a more reasonable supposition on this kind of question is all that the holder is called upon to show.

The note sued on is signed by four different persons, one styling himself "president," another "vice president," another "secretary," and the fourth "treasurer."  Why this string of names to bind a corporation, no one with a particle of business sense can conceive of.  A corporation is generally bound by one person authorized by its charter or by-laws so to do.  All the

officers are nowhere required to sign the obligations of a corporation, in order to make it the corporation's obligation.

The gravamen of the complaint of appellees is that Phelps had superior knowledge, and that they were unacquainted with the law pertaining to such matters. To admit testimony of this character from gentlemen who set themselves up as capable of managing the affairs of a manufacturing corporation is to stretch the exceptions to indefinite bounds.

There does not appear to me to be any proper application of the citations to the facts in the case at bar.