## CARRELL v. McMURRAY.

(Circuit Court, W. D. Arkansas, Ft. Smith, Division. March 25, 1905.)

1. REFORMATION OF CONTRACT—GROUNDS—MISTAKE OF LAW.

Where a contract as written, through mistake of either fact or law, fails to embody the actual agreement and intention of the parties, a court of equity will reform it to conform to such agreement and intention.

[Ed. Note.—For cases in point, see vol. 42, Cent. Dig. Reformation of Instruments, §§ 68–78.]

2. SAME—DEED.

Plaintiff and defendant entered into a parol agreement for the exchange of a farm owned by plaintiff for a store and stock of goods owned by defendant, subject to an examination thereof by plaintiff. By such agreement, as testified by both parties, plaintiff was to retain possession of the farm until the ensuing January and receive the rents for the current year. Plaintiff had a deed drawn, stating the agreement fully to the draftsman; but the latter made no reservation in the deed, being of the opinion that it was not proper or necessary. Defendant also had a written contract drawn, which was signed by the parties and which contained no reference to the rents or time of giving possession, although such terms were stated by defendant to the draftsman. Owing to subsequent occurrences defendant became desirous of repudiating the contract, and demanded its modification, so as to give him immediate possession of the land and the rents, which plaintiff refused, insisting on the agreement as made. Defendant then consulted a lawyer, who, on examining the deed, which defendant had not previously seen, advised him that it carried the right to immediate possession and the rents, and defendant then completed the trade and accepted the deed, without stating the fact of such advice to plaintiff. Held, that plaintiff was entitled to have the deed reformed to embody the actual agreement and understanding of both parties when the contract was made, both on the ground of mistake and of fraud.

In Equity.

J. V. Walker, for complainant.

Brizzolara, Fitzhugh & Wellshear, for defendant.

ROGERS, District Judge. This is a bill of complainant to reform a deed and to enjoin the defendant from the prosecution of a suit at law against the complainant. The complainant, John W. Carrell, owned a farm in Benton county, Ark. He resided at Springdale, a village in that county, and was by occupation a farmer, merchant, and banker. The defendant was a citizen of Memphis, Tenn., and had a store at Cameron, in the Indian Territory. The defendant desired to go out of business at Cameron. The complainant, having learned of this fact, perhaps through Mr. Black (who was a brother-in-law, and a merchant at Cameron), opened correspondence with the defendant at Memphis, proposing to trade him his Benton county farm for the store and goods at Cameron. The correspondence culminated in defendant going to Benton county on the 11th or 12th of July, 1900, to examine the farm. After going over the farm the parties entered into a conditional oral agreement to exchange the farm for the store and outhouses and the goods at Cameron. In the exchange the farm was to be valued at $20 per acre, and the balance due on the goods and

houses at Cameron to be paid for in cash after the goods were invoiced. Indeed, defendant testifies that at that time complainant refused to go to Cameron to examine the goods, unless it was agreed he should have $20 an acre for his land and retain possession of the farm until January 1, 1901, and have the rents for 1900. The reason for retaining possession and the rents is conclusively shown, viz., that complainant's stock of hogs and cattle were on the farm and had to be cared for, and there were also unsettled accounts with complainant's tenants that he wanted to adjust out of that year's rent. There is no dispute about so much of the agreement as is above stated. There is some controversy about the terms of the oral agreement then made as to the properties at Cameron, as will be seen later. Accordingly, on the 13th of July, defendant left for Cameron, and arrived there the same day, and immediately gave directions for the store to be cleaned up, so that the plaintiff (who was expected next day) could look over it to advantage. On the next day, the 14th of July (which was on Saturday), complainant arrived at Cameron. They proceeded at once to look over and invoice the showcases and fixtures. Defendant contends that during the day, while negotiating about the Cameron properties, there was some friction, growing out of a disposition by complainant to embrace things which were not included in the oral agreement made at Springdale on the 12th of July. There were some differences in the valuations of the showcases and fixtures, natural enough between the parties. These differences were, however, adjusted; and beyond this I am unable to find that there was any other friction about the trade until defendant, at his own suggestion, prepared a memorandum in writing of what he claimed was the oral contract at Springdale, and submitted it to complainant. Parts of this memorandum agreement were objected to and stricken out. The paper was then redrafted and signed by the parties. It is as follows:

"This agreement, made and entered into between J. W. Carrell and W. H. McMurray, made this the 14th day of July, witnesseth: That the above-named parties agree to the following trade and conditions hereinafter named: That for and in consideration of J. W. Carrell's 486-acre farm, situated about 15 miles east of Springdale, Arkansas, which is valued at $20.00 per acre, amounting to $9,720.00, W. H. McMurray agrees to sell his store building, two frame storerooms situated back of store and stables, also the vacant property on west side of and back of the store and enclosed under barn fence, all of which is valued at $3,000.00. This does not include either of the dwelling houses nor the lots on which they are situated. It is further agreed that the goods in the store shall be furnished at invoice prices to the amount of $6,720.00, which with the above-mentioned $3,000.00 is in full payment for the 486 acres farm land. It is further agreed that said Carrell shall pay W. H. McMurray cash for the balance of goods at the rate of 80 per cent. on the invoice cost of goods. It is further understood by both parties that any goods that are damaged shall be put in at their actual value.

"J. W. Carrell.
"W. H. McMurray."

This agreement I find, after a careful review of the evidence pro and con, embraces the same terms as the oral agreement (as far as it goes) made at Springdale, Ark., July 12th. Defendant at-

tempts to show by his own evidence that this agreement was not the same as the agreement made at Springdale, and gave complainant advantages which the oral agreement did not. This is unimportant now; but I do not think the evidence sustains that contention, but quite the contrary. There were some details, as stated, which had to be and were adjusted at Cameron, which were not specifically adverted to in the agreement at Springdale. This was necessarily contemplated by the parties. The values of fixtures and showcases and the like could not be settled fairly by either party except after inspection, and complainant had not examined these at all, and defendant had not seen them for some time. It may be noted in this connection that, while these fixtures and show cases were not adverted to at Springdale, neither are they mentioned in the written agreement of July 14th, although it is conceded that they went with the store and were paid for by complainant. Defendant contends, further, that the barns and lots adjoining were not embraced in the agreement at Springdale. The written notes made by complainant in a small book at the time spoke of the real property at Cameron as "the storeroom and outbuildings," and they were valued at $3,000. No doubt the barn and adjoining lots were embraced in the words "outbuildings" in the Springdale agreement. At all events they are specifically embraced in the written agreement of July 14th prepared by defendant. It does not appear that there was any controversy over them. Indeed, they appear in the original draft of the agreement made by defendant himself as embracing what he understood the Springdale agreement to be. I conclude that these contentions by defendant relating to price of fixtures and barns and lots were mere afterthoughts, intended to make some moral showing for his course of procedure about the rents for 1900. In this connection it is apposite to note that in his letter of August 4, 1900, in which he reviews at considerable length the negotiation and trade, and asserts his rights, he never refers to the barns and adjacent ground. At all events, they are of no importance now, inasmuch as he voluntarily embraced them in the written agreement of July 14th, and no one can read the evidence in this case and fail to get the impression that in that trade defendant's sole purpose was to get something for all he let go.

It may be of some importance to note, contrary to the impression defendant seeks in his evidence to make, that the negotiation at Springdale went so far that complainant learned from defendant to whom he wished the deed to the lands made; for, on the same day defendant left Springdale for Cameron, complainant took his title papers to the land to his brother-in-law, Anderson Sanders, who was a merchant at Springdale, and not a lawyer, and gave him the terms of the trade, stating, among other things, to whom to make the deeds, and that Carrell was to retain the rent for 1900 and the possession of the land for that year, and instructed him to draw the deed and get his sister, plaintiff's wife, to sign and acknowledge it. This Sanders did, and held the deed for further

orders from complainant. In drawing the deed he did not reserve the rent for 1900 or the right to the possession for that year. Complainant and Sanders both say they did not think it proper to put that in the deed. They doubtless thought the oral agreement sufficient to hold possession and the rents for 1900. It thus appears that when the written memorandum agreement of July 14th, providing the terms of the sale, was signed, the deed to complainant's farm was already drawn, signed, and acknowledged, and defendant was totally ignorant of its contents. When complainant left Springdale for Cameron, he left the deed with Sanders. After the written agreement of July 14th, supra, was executed at Cameron, complainant telegraphed for Sanders' son to bring him the deed and a $3,000 draft to pay for the Cameron real estate. Sanders came on Monday at noon, and brought both deed and draft. Meantime a generous rain fell on Saturday night at Cameron, brightening the outlook for the cotton crop already suffering from drouth. The evidence discloses no controversy, or even mention, at Cameron of the rents or possession of the farm for 1900 before the contract of July 14, 1900, was signed. Up to that time the contract at Springdale stood, as to the rents and possession of the farm for 1900, as agreed upon at Springdale. But next day, after the rain on Saturday, we first hear of the rents as a matter of contention by defendant. Durwood McCarty, a witness for the complainant, and who is a cousin of defendant, testifies that he was with defendant on Sunday afternoon—

"And we was talking about the trade, and he told me then something about how they traded. He said they had a good rain, and the prospects of a good crop, and he didn't think it was right to turn over the store to Mr. Carrell then and not get the farm until January, and if he wouldn't agree to let him have the farm then he wouldn't make no trade on Monday, or back out; that he didn't think it was right for him to turn over the goods then and not get the farm until January. All his year's profits in the store would be from there on."

It was the very next morning, early, when McMurray himself testifies that he told Carrell he did not intend to go on with the trade. He says he did not enter into his reasons to complainant for repudiating the contract. James M. Burdick, the brother-in-law of defendant and his own witness, testifies that defendant told him Monday morning, before Carrell came into the store, that he believed he would not trade, and that the contention that day was over the rents. J. P. McDow, defendant's witness, also testified that early Monday morning, when he went to the store, complainant and defendant were talking over the trade. Defendant wanted to call it off, and complainant was insisting on going on under the contract. McMurray was contending for the rents. Robert Stalcup, complainant's witness, heard part of the conversation Monday morning, and states it as follows:

"Q. Now, you may begin, and in your own way tell what you heard of this conversation, and state the names of the parties who entered into the conversation and what they said. A. On Monday morning, after the trade was made on Saturday, Mr. McMurray was in the store, and Mr. Carrell came in presently, and when Mr. Carrell came in Mr. McMurray approached him,

and he said he inferred from a letter he had received from him in Memphis that he got the rent of that farm for the year 1900, I believe it was. And Mr. Carrell says: 'No.' He says: 'That wasn't the trade.' Mr. McMurray says: 'Well, we just call the deal off then.' And Mr. Carrell says: 'No; we will have it just like we had it Saturday.' "

A little later in the deposition the same witness said:

"A. Yes sir; I heard him [McMurray] say something about the rain. He said that we had had a nice rain, and something to that effect, and that he believed he wouldn't trade. He said it had rained, and he believed he would call the deal off if he could, or something like that."

W. P. Pollard, a witness for complainant, testified that on Monday morning—

"I was working around there in the store and I passed behind where they were sitting on the counter— Q. (interrupting). Now, you say 'they.' Give the names of the parties. A. Mr. McMurray and J. W. Carrell were sitting on the counter, and I passed around behind the counter to make a ticket on the register they use there, and make change, and I heard Mr. McMurray say to Mr. Carrell: 'As you are to keep the farm until the first of January, why not me keep the store and both turn over at the same time?' And Mr. Carrell said: 'No; we will not make a new contract. We will just go on with the old one.' And Mr. McMurray said: 'Well, if you will turn over the rent corn, why we will go ahead and invoice.' And Mr. Carrell said: 'No; we will go ahead just as the trade was made Saturday.' And that was about all I heard about it. That is all I know."

C. G. Adkins, who was the bookkeeper of McMurray, and who did the writing on Saturday for McMurray, testifies that when McMurray was dictating the terms of the sale he said:

"Q. Did he say anything about who was to get the rent for that year? A. Well, he said Mr. Carrell was to get the rent for that year, and he wanted the preference of renting it for the next year."

Complainant relates what took place Monday morning as follows:

"Q. Where did you first meet McMurray on Monday morning, after Saturday night. A. At the store. Q. You may begin at that point and state what occurred between you. A. I went to the store, as we agreed to meet and go to work Monday morning, close up and all, and he said he didn't want to go ahead with the deal unless I would throw in the rent. Q. What reply did you make? A. I told him I didn't want to do that, and that the deal would go on as we had commenced. Q. What next was said by either of you? A. He says that 'as you are to keep the farm until January,' he says, 'I ought to keep the store and we will both turn over at the same time.' I told him he ought to have thought of that sooner. He said he didn't want to go on with the deal, then, unless I would agree to one or the other."

The result of this controversy about the rents on Monday morning was a refusal of defendant to go on with the trade. Meantime the train arrived, and Sanders' son came and brought the deed and draft for $3,000. These were tendered to McMurray, and refused. Both parties went to consult attorneys; Carrell insisting that he would see if there was any law to force defendant to complete the trade. His attorneys told him to go to Adkins and get the written contract of July 14th, and when he went to get it McMurray had taken it and gone. While in the store McMurray came in and asked complainant for the deed, that he might submit it to his attorney. Up to this time McMurray did not know the contents of

the deed. His attorney, after reading the contract and the deed, advised him that the deed carried the rents, in the absence of any reservation in the deed. McMurray immediately returned to the store and ordered the store closed and the clerks to invoice the goods. Carrell's attorneys had never seen either the deed or the agreement, and gave him no advice in regard thereto. McMurray concealed from Carrell the fact that his attorney advised him that the deed would give him the corn and the right to immediate possession, but did tell him, he says, "I wanted it understood the corn crop went to me, and I didn't want any trouble over it." And he says "Carrell replied: 'If this contract gives you the crop, you can have it; but you cannot get it, except at the end of a lawsuit.' To which he replied: 'All right; it certainly gives it to me.' And we went to work to invoice the goods to him." It will be observed that according to McMurray's own evidence the conversation was confined entirely to the contract. No mention was made of the deed, while it was the deed which carried the corn, and not the contract.

It is thus made clear by defendant's own evidence, with a full knowledge on his part that Carrell had never consented for him to have the corn crop or possession of the land for 1900, and he could only get it by a lawsuit, he consummated the deal, in open, flagrant violation of their oral agreement, as to the possession of the land and the rents for the year 1900, at Springdale, knowing and concealing from Carrell the fact that his attorneys had advised him that the deed, and not the agreement, carried the corn, because there was no reservation of it in the deed. This is clearly and conclusively shown by all the evidence bearing on the point, and to the entire satisfaction of the court. It is fair to assume that, up to the time when defendant submitted the July 14th agreement to his attorney, he supposed the agreement did not give him the corn, or, if he supposed he could get the corn, that it would pass by reason of the fact that it was not mentioned in the agreement, and that the agreement would exclude all the oral agreement made at Springdale on the 12th of July; but this cannot be assumed after the defendant submitted the agreement to his attorney, because he was immediately sent back by his attorney for the deed, and at that time he did not know the contents of the deed. When the deed was submitted to his attorney, then it was clear that the deed contained no reservation of the corn, and therefore passed the corn to him. He therefore not only concealed this fact from Carrell, but he misled him by saying the contract, not the deed, gave him the corn. This was not true, and he must have known it, because the attorney did not advise him until he had examined the deed. It is true that on cross-examination Mr. McMurray says:

"Q. Did you tell Carrell that you consulted with your lawyer, and the lawyer said you would get the corn? A. I don't know that I told him I had consulted with my lawyer, and that my lawyer had told me that; but I told him I wanted to have the deed examined, and I told him this deed gave it to me. Q. You didn't tell Carrell, then, that the lawyer told you that the deed gave you the corn? A. I cannot say that I did or did not."

Obviously this testimony cannot be true, at least in the way in which it is stated, because it appears from all the evidence that McMurray knew nothing about the contents of the deed when he applied to Carrell for it, with the statement that he wanted to have his counsel examine it. He could not, therefore, have told him at that time that the deed gave him the corn, because he didn't know anything about the deed, even if he were capable of construing it. And in the same cross-examination, and prior thereto, this testimony appears:

"Q. Did you have any further conversation about the corn on that trip [that is, the trip to Springdale, when the defendant went to examine the farm]? A. It was understood— I don't remember the wording. We had an understanding, if we traded at Springdale on the terms as outlined there, that Mr. Carrell was to keep the rent corn. Q. When you left Springdale to come to Cameron, the understanding was that Carrell was to get the rent corn? A. Yes, sir; and I was to get the cost of my goods in the house at Cameron. Q. After that time, and up to and including the time when the goods were turned over to Carrell, did Carrell ever agree you were to have the rent corn? A. Yes, sir; he said if I could get it under the contract I could have it. Q. Did you understand from that that he had surrendered his claim to the rent corn? A. I told him that contract would take the corn, and that under the contract made Saturday it was mine. I didn't want any lawsuit or trouble; and he said, 'If you cannot get it under the contract, you cannot get it any other way.' Q. Did you understand from Carrell that he had surrendered his claim to the rent corn? A. Well, I don't know that I did. I don't know that he had surrendered. My impression was he thought under the contract he could still hold the corn."

I take it this testimony is true, and what Mr. McMurray said about the deed is untrue. Both cannot be true. It must be remembered that, when both the deed and the written agreement of July 14th were drafted and signed, neither of them embraced the full agreement of the parties. Both parties agreed that there was no controversy between them as to the terms of the oral agreement at Springdale, so far as it related to the rent corn and the right to the possession of the land for 1900; and both parties agreed that there was no controversy at Cameron as to the rent corn and the possession of the land for 1900 up to the time they signed the agreement of July 14th. The controversy began on Monday morning, July 16th, after the rain had fallen on the night of the 14th of July previous. It is not contended that defendant gave any directions to the draftsman as to the contents of the deed, but it stands admitted that the plaintiff advised the draftsman that complainant was to retain the rents and the possession of the land for the year 1900; but the draftsman did not include the reservation of either in the deed. On the other hand, complainant gave no instructions as to the written agreement of July 14th. Defendant did that, and he also informed the draftsman of the agreement that the rents of 1900 were to go to the complainant; but Adkins did not include any reservation of the rents in the agreement. The mistake, therefore, was in both instances the mistake of the draftsman. The terms of the agreement were not misunderstood by either of the parties, and no controversy had arisen about the rents until the rain had fallen on the night of July 14th, after which I think the

conclusion is irresistible that defendant decided that he had made a bad bargain and set to work to rue the contract or get the rent corn in plain violation of his agreement. A fair consideration of all the evidence leaves no reasonable doubt on this point. The mistake as to the legal effect of the first written agreement, and the deed when drawn, was mutual, and remained so until the rain fell, whereupon the defendant, in his effort to escape his agreement, gained from his attorney the knowledge of the legal effect of the deed, and sought to gain a legal advantage by disregarding his agreement as he admits it was originally made. In his effort to do so he misled the plaintiff, both by concealing his knowledge of the legal effect of the deed and by representing to plaintiff that the agreement, and not the deed, gave him the corn. It required no legal advice to apprise defendant that his conduct in these respects was both unfair and unconscionable, and no court should suffer itself used to permit such a result as he seeks to consummate.

In volume 24, American and English Encyclopædia of Law (2d Ed.) p. 648 et seq., the author states the rules governing the reformation of deeds as follows:

"(1) The most usual ground for granting the reformation of an instrument is that through a mistake it does not correctly set forth the true intent of the parties. Thus a clerical mistake of the scrivener who drew up the instrument may be corrected. (2) In order to grant relief on the ground of mistake, the mistake must have been mutual. The minds of the parties must have met upon some agreement other than that which the instrument expresses. (3) In some jurisdictions the court will grant reformation in all cases of mistake, even though the mistake be one of law, such as, for example, the legal effect of terms employed in the writing. But in other jurisdictions the courts hold that relief can be granted only in case of a mistake of fact. (4) The presumption always is that a written instrument expresses the true intent of the parties, and hence the burden of proof is upon the party seeking reformation, who must, in order to obtain the relief, furnish clear and satisfactory evidence that the circumstances are such as to warrant the interposition of a court of equity to grant the relief asked for. (5) But where the proofs are satisfactory, and the mistake is made entirely plain, relief will not be denied merely because there is conflicting testimony. (6) The existence of a mistake may be shown by parol evidence. (7) It has been asserted that, while fraud has been a ground for rescission, it is not a ground for reformation; but the better rule is that fraud may be a ground for reformation, especially where it is accompanied by mistake, as where there is a mistake of one of the parties accompanied by fraud on the part of the other."

The text notes are supported by numerous decisions, state and federal. In different jurisdictions there is a hopeless conflict. No profit could result from an effort to distinguish classes of cases, or from any review I might make. I am of the opinion that the deed in this case should be reformed on either the first, second, or seventh grounds quoted supra. I think the old rule of equity, confining the reformation of instruments to mistakes of fact only, is in modern times gradually being relaxed in all the courts, and decisions enforcing exceptions to the rule resting on special circumstances have well-nigh undermined the rule itself. Courts do not make contracts for the parties, whether the matters complained of result from errors of law or fact, but will correct errors so as to enforce contracts, whether they be errors of law or fact, and whether tainted with

fraud or not, if it is made clear that the contract does not embody the agreement of the parties. This view is sanctioned in a note to Williams v. Hamilton (Iowa) 65 Am. St. Rep. 489:

"A perusal of adjudged cases also justifies the statement that the distinction between errors of law and errors of fact is of much less importance in the reformation of contracts than is commonly supposed, that it has had very little practical effect upon the decisions of the court, and that, while not ignored, it is not unfrequently mixed up with other considerations which outweigh it. 'It is no longer true, if it ever was,' says Torrance, J., in Park Bros. & Co. v. Blodgett & Clapp Co., 64 Conn. 28, 33, 29 Atl. 133, 'that a mistake of law is no ground for relief in any case, as will be seen in the cases hereinafter cited. Whether, then, the mistake in question be regarded as one of law or of fact is not of much consequence. The more important question is whether it is such a mistake as a court of equity will correct; and this, perhaps, can only, or, at least, can best, be determined by seeing whether it falls within any of the well-recognized classes of cases in which such relief is furnished.' "

In State v. Paup, 13 Ark. 137, 56 Am. Dec. 303, after stating the general rule, the court said: "Ignorance of law excuses no man." And, quoting from an authority cited to the effect that "there are cases in which a court will interfere on the ground of such mistake in order to relieve a party from the effect of a contract, as, for instance, if one is ignorant of a matter of law involved in the transaction, and another one, knowing it to be so, takes advantage of such circumstances to make the contract, here the court will relieve, although, perhaps, more probably on account of fraud in the one party than of ignorance of law in the other." The Supreme Court of Arkansas says:

"So, if both parties should be ignorant of a matter of law, and should enter into a contract for a particular object, the result whereof would by law be different from what they mutually intended, here on account of the surprise, or immediate result of the mistake by both, there can be no great reason why the court should not interfere in order to prevent the enforcement of the contract and relieve from the unexpected consequence of it. To enforce it would be to permit one party to take an unconscientious advantage of the other and to derive a benefit from a contract which neither of them intended it should produce."

In Bank v. Arndt, 69 Ark. 410, 65 S. W. 1052, the whole subject is ably discussed by Judge Battle on a motion for rehearing, and it may be inferred, therefore, was thoroughly considered, and he clearly recognizes the principle announced. Indeed, in reviewing the cases, as it is not unusual with Chief Justice Marshall's decisions, all the cases go back to Hunt v. Rousmanier, 8 Wheat. 174, in which he says, at page 175 of 8 Wheat. [5 L. Ed. 589]:

"Although we do not find the naked principle that relief may be granted on account of ignorance of law asserted in the books, we find no case in which it has been decided that a plain and acknowledged mistake of law is beyond the reach of equity."

In reviewing the authorities in Bank v. Arndt, supra, Judge Battle quotes, in support of that decision, from Story's Equity Jurisprudence, Bispham's Equity, Pomeroy's Equity Jurisprudence, Snell v. Insurance Company, 98 U. S. 85, 25 L. Ed. 52, and Griswold v. Hazard, 141 U. S. 260, 11 Sup. Ct. 972, 999, 35 L. Ed. 678.

To avoid extending this opinion, which I have found it difficult.

to shorten because of the evidence, I cite, as sustaining the conclu-sion reached, Champlin et al. v. Laytin, 1 Edw. Ch. 472; Clack v. Hadley et al. (Tenn. Ch. App.) 64 S. W. 403; Pickett et al. v. Merchants' National Bank of Memphis et al., 32 Ark. 352; Thomp-son v. Phœnix Ins. Company, 136 U. S. 295 et seq., 10 Sup. Ct. 1019, 34 L. Ed. 408; Trenton Terra Cotta Co. v. Clay Shingle Co. (C. C.) 80 Fed. 46; Fulton v. Colwell et al., 112 Fed. 831, 50 C. C. A. 537; Chicago & A. Ry. Co. v. Green (C. C.) 114 Fed. 676; Elliott v. Sackett et al., 108 U. S. 132, 2 Sup. Ct. 375, 27 L. Ed. 678. In Walden v. Skinner, 101 U. S. 577, 25 L. Ed. 963, quoting from page 583 of 101 U. S., the Supreme Court say:

"Decisions of undoubted authority hold that where an instrument is drawn and executed that professes or is intended to carry into execution an agree-ment, which is in writing or by parol, previously made between the parties, but which by mistake of the draftsman, either as to fact or law, does not fulfill, or which violates, the manifest intention of the parties to the agree-ment, equity will correct the mistake, so as to produce a conformity of the instrument to the agreement; the reason of the rule being that the execution of agreements fairly and legally made is one of the peculiar branches of equi-ty jurisdiction, and, if the instrument intended to execute the agreement be from any cause insufficient for that purpose, the agreement remains as much unexecuted as if the party had refused altogether to comply with his agree-ment, and a court of equity will, in the exercise of its acknowledged juris-diction, afford relief in the one case, as well as in the other, by compelling the delinquent party to perform his undertaking according to the terms of it and the manifest intention of the parties. Hunt v. Rousmanier's Adm'rs, 1 Pet. 1, 13 [7 L. Ed. 27]; Id., 8 Wheat. 174, 211 [5 L. Ed. 589]. Even a judg-ment, when confessed, if the agreement was made under a clear mistake. will be set aside, if application be made and the mistake shown while the judg-ment is within the power of the court. Such an agreement, even when made a rule of court, will not be enforced, if made under a mistake, if seasonable application be made to set it aside; and, 'if the judgment be no longer in the power of the court, relief,' says Mr. Chief Justice Marshall, 'may be obtained in a court of chancery.' The Hiram, 1 Wheat. 440, 444 [4 L. Ed. 131]."

In Chicago & A. Ry. Company v. Green, supra, at page 678 of 114 Fed., Judge Philips uses this language:

"The same rule respecting the province of a court of equity to correct mistakes is laid down by Bispham in his work on the Principles of Equity (4th Ed.) § 185, as follows: 'A mistake exists when a person, under some erroneous conviction of law or fact, does or omits to do some act which, but for the erroneous conviction, he would not have done or omitted.' And this principle has application to the omission to write into the release the addi-tional consideration of the undertaking that the railway company would as-sume the payment of the doctor's bill. Thus, Mr. Bispham, at section 190, says that 'where there was an agreement that part of the purchase money of certain real estate should be paid by a judgment note for a certain sum, with interest, and the words "with interest" were omitted from the note by the mistake of the scrivener by whom it was written, it was held that this was such a mistake as equity would correct.' And if in fact this additional con-sideration to pay the doctor's bill entered into the contract of settlement and was not inserted in the release, either from inadvertence or misconcep-tion of the law as to the necessity of inserting it in the instrument to make it operative as a release, such fact does not deny to complainant the assistance of a court of equity to reform it in this respect. As said by the Supreme Court of this state in Corrigan v. Tiernay (Mo.) 13 S. W. 401: 'In such cases equity will reform the contract; and this, too, though the instrument fails to express the contract which the parties made, by reason of the mistake of law.' Says Pomeroy: 'In short, if a written instrument fails to express

the intention which the parties had in making the contract which it purports to contain, equity will grant its relief, affirmative or defensive, although the failure may have resulted from a mistake as to the legal meaning and operation of the terms or language employed in the writing.' "

The testimony in the case shows that the farm was surrendered by the plaintiff to the defendant before the 1st of January, 1901. A decree, therefore, reforming the deed at this time, would be of no service to the complainant, and would be futile. Courts of equity do not render decrees which give no relief. A decree, therefore, should be entered enjoining the defendant from the prosecution of his suit at law for the rents, pasturage, possession, or damages for the retention of the place from the date of the deed to the 1st day of January, 1901.

Such will be the decree of the court. It is so ordered.

---

### THE C. R. HOYT.

(District Court, D. New Jersey. March 31, 1905.)

1. COLLISION—STEAM VESSELS MEETING—VIOLATION OF RULES.

The tug Hoyt, passing up East river on the Brooklyn side in the daytime, exchanged crossing signals with the ferryboat Fulton, crossing from New York; the Hoyt, as the privileged vessel, being required to keep her course and speed, and the Fulton to cross under her stern. The Fulton, however, held her course, and came so close to the Hoyt that the latter, to avoid collision, when under the Fulton's bows starboarded her helm, throwing her head nearly across the river. During such time the tug No. 9 was coming down the river, and had given three signals to the Hoyt for passing port and port, none of which were answered. After the Hoyt had passed the Fulton, both she and the No. 9 gave alarm signals, ported, and reversed, but were then so near together that a collision occurred. *Held*, that the danger of the Hoyt from the Fulton, which was within full view of the pilot of the No. 9, was a "special circumstance" within the meaning of the rules (23 Stat. 438 et seq., rule 23) which required the latter to slacken speed or to stop and reverse, and that she was in fault for keeping her course and speed; that the Hoyt was also in fault for failing to answer the signals of the No. 9, although not for her maneuver in passing the Fulton.

[Ed. Note.—Collision. Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

2. SAME—DIVISION OF DAMAGES.

Under the American, and also the English, rule in admiralty, where each of two vessels contributes by her fault to a collision, the damages will be equally divided.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, § 296.]

In Admiralty. Libel and cross-libel for collision.

James J. Macklin, for libelant.
Carpenter & Park, for cross-libelant.